UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
DANIEL RINCON,

              Petitioner,      :     REPORT & RECOMMENDATION

              -against-      :     05 Civ. 0686 (LTS)(MHD)

JOHN W. BURGE, Superintendent,
Auburn Correctional Facility,   :

            Respondent.  :
--------------------------------x
RAFAEL PEREZ,

              Petitioner,     :

              -against-      :     05 Civ. 0687 (LTS)(MHD)

JOSEPH SMITH, Superintendent,
Shawangunk Correctional
Facility,                   :

            Respondent.
--------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:

    Petitioners Daniel Rincon and Rafael Perez have filed separate
petitions seeking to challenge their June 27, 1995 judgments of
conviction in New York State Supreme Court, New York County, on a
variety of charges stemming from their participation in a large
narcotics conspiracy. Rincon was convicted of five counts of
second-degree murder, six counts of second-degree criminal
possession of a weapon and single counts of first-degree
conspiracy, second-degree attempted murder and second-degree
assault. Perez was convicted of single counts of second-degree

1

murder, second-degree weapon possession and first-degree conspiracy. Both are currently serving long prison terms, Rincon having been sentenced to an aggregate term of 158 1/3 years to life and Perez having been imprisoned for 50 years to life.

In seeking a writ of habeas corpus, Rincon presses four grounds for relief. He first argues that the State failed to prove the existence of a single conspiracy, as distinguished from multiple conspiracies. (Rincon Memo of Law at 20-26; Rincon Pet. ¶ 12(C)). Next, he challenges the trial court's jury charge as erroneously instructing the jury on the difference between multiple conspiracies and a single conspiracy, on the role of lay witnesses as experts and on the burden of proof on identification issues. (Id. ¶ 12(A); Rincon Memo of Law at 26-32).[1] He further argues that the trial court erred in denying a pre-trial severance motion (id. at 32-34; Rincon Pet ¶ 12(B)), and that the prosecutors violated his due-process rights under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny by concealing exculpatory evidence. (Id. ¶ 12(D)).[2]

_____

[1] In an attachment to his petition, Rincon also refers to a purported error in giving a lesser-included-offense charge, but this claim plainly pertains only to Perez, not Rincon. (Rincon Pet. at "Attached addition").

[2] We summarize these claims in the order found in Rincon's memorandum of law, which accompanies his petition. We also note that in Rincon's memorandum, his challenge to the jury charge is limited to the conspiracy instructions. In his petition, however, he also alludes to asserted errors in discussing the assessment of police-witness expertise and the burden of proof regarding

2

As for Perez, in his briefing he invokes the same four basic claims as are pressed by Rincon. Thus he asserts the same Brady issue and also complains -- as did Rincon -- about the denial of a severance. He further criticizes the adequacy of proof of the conspiracy and the jury instructions concerning conspiracy on the same grounds as Rincon. (Perez Memo of Law at 15-31). Apart from the arguments that Perez presses in his briefing, he includes in the body of his petition and in an attachment three claims not made by Rincon. He also expands his challenge to the court's instructions to encompass two further criticisms, which Rincon also alludes to in an attachment to his petition. Thus, both petitioners allege that the trial judge failed to qualify several police witnesses as experts and erroneously left that task to the jury without proper guidance, and that she failed to tell the jury that the State bore the burden to show that the defendants were the ones who had committed the charged crimes. (Perez Pet. at "Attached addition", first page). As for Perez's three additional claims, none of which were made by Rincon, in the body of the petition he asserts claims of ineffective assistance of appellate counsel (Perez Pet. ¶ 12(B)) and improper refusal of the trial judge to charge the jury as to the lesser-included offense of first-degree manslaughter as an alternative to the murder charge on which Perez was convicted. (Id. ¶ 12(C); see also id. at "Attached addition",

---

identity issues.

first page). Then, in the "addition" to Perez's petition he complains that he was denied a fair trial because the trial judge persistently denigrated or mocked defense counsel before the jury, reflecting judicial bias and thereby improperly influencing the jury. (Id. at "Attached addition", first and second pages).

Respondent of course opposes both petitions, contending that Perez's petition is untimely and that Rincon's claims are in part procedurally barred and entirely meritless. (Resp. Memo of Law at 12-50). For the reasons that follow, we recommend that the writ be denied and the two petitions dismissed with prejudice.

A. Background

The evidence presented at trial permitted the triers of fact to find that Rincon and Perez were high-level members of a large narcotics-distribution organization. The group was established by two brothers, Nelson and Lenin Sepulveda, and engaged in the sale of crack cocaine in at least four locations in the Mott Haven area of the Bronx and at least one location in the Brighton Beach neighborhood in Brooklyn.

4

### 1. The Sepulveda Organization

The Mott Haven operation was run from 605 Beech Terrace, 348 Beekman Avenue, 592/600 East 141st Street and 613 East 138th Street.[3] The crack vials sold at Beech Terrace usually had red or green tops, the ones at Beekman Avenue had red tops and those sold at the other two locations initially had red tops and then, for most of the relevant period, had orange tops.[4]

Each drug spot had a spot manager, who reported directly to the more senior "bosses". The bosses hired, supervised and paid the managers and also obtained the drugs that were then sold at the spots.[5] The spot managers, who were paid between $500.00 and $900.00 weekly,[6] in turn each supervised a group of shift managers, who worked eight-hour rotating shifts.[7] The spot managers also delivered bundles of crack vials to the selling locations and

---

[3] E.g., Tr. 8977-80, 9041, 9400-01, 9644-46, 9859-64, 9872, 9934-35, 9941, 13574-75, 13581-82, 13667, 13705.

[4] Tr.   957-58, 1455, 1467, 1722-24, 1775-77, 2379-80, 3295-301, 7052, 8446, 8975, 9693-94, 8870, 9802, 9963, 10868-73, 13584, 14557, 16222-24.

[5] Tr. 8475-77, 8992-93, 10595, 11486-87, 13597, 13608-09.

[6] Tr. 2380, 8442, 9706, 9936-38, 11339, 13808.

[7] Tr. 1473-76, 1904, 2386-88, 8884, 9689.

5

collected bundles of cash from those spots.[8] The shift managers supervised a cadre of paid hand-to-hand sellers (known as "pitchers") and lookouts.[9] The shift managers did the day-to-day management of the spot, including collecting money from the sellers, supplying equipment, keeping track of drug inventory, paying the sellers and lookouts, and maintaining discipline.[10] The spots generated substantial revenues; for example, the 605 Beech Terrace location made a net weekly profit of about $30,000.00, and the 348 Beekman Avenue spot grossed sales each week of between $120,000.00 and $150,000.00.[11]

The level of sophistication of the business is also reflected in its maintenance of a series of so-called stash apartments, where the dealers kept drugs, money and weapons, often in safes.[12] The organization paid the tenants in those apartments for the use of their units,[13] and shift managers would sometimes stay at the

---

[8] Tr. 1783-84, 9688-99, 9706, 11335-38, 12218-23, 13717.

[9] Tr. 1107-12, 1743-47, 1781-84, 2379, 2421, 5643, 6369-72, 6383-84, 6978, 6981-82, 6991, 8889, 9199, 9827-31, 11327, 16254.

[10] Tr. 1647, 1782-84, 2384-85, 2415-15 2468, 4173, 4549-50, 6367, 6372, 6930, 6948, 6986, 8827-28, 8980-85, 8774, 8982, 9688-89, 9694-95, 10110-12, 10018, 11367-69, 13587-91, 13600, 13713.

[11] Tr. 13592, 13807-08.

[12] Tr. 2451-52, 2476, 5668-70, 5696, 6896-902, 9700, 9850-51, 11125.

[13] Tr. 2451, 4286-87, 6907, 7009, 7143, 11331.

6

apartments while they were working.[14] The organization also maintained separate so-called "kitchens" at other apartments, where they or their workers cooked powder cocaine into crack, placed the converted substance into vials with red and orange tops, and bundled the vials.[15] The drugs were then transported to the stash apartments in cars with concealed compartments, which were also used to transport money and firearms.[16]

2. Rincon's Role

In 1986 the Sepulveda brothers began to sell crack at the Beech Terrace location and build the drug-distribution organization.[17] After a fire at that address in 1988, the Sepulvedas expanded their operation to sell their drugs at various other street locations.[18] Rincon acted at that time as a manager for the Sepulvedas and inspected the vials at the various locations.[19] In 1989 the Sepulvedas moved their business to a location called "The

---

[14] Tr. 2394-95, 2474, 4549-50.

[15] Tr. 11368-70, 11491-96, 11529, 13011-2, 13014, 13018-19, 13023-24, 13028-31, 13063-64, 13170, 13193.

[16] Tr. 9122-27, 12214-18, 13219-23.

[17] Tr. 13574-75, 13577, 13582, 13584, 13647.

[18] Tr. 2446-47, 8903-08, 9835-6, 13598-99.

[19] Tr. 2463-64.

7

Hole" at nearby 348 Beekman Avenue, where their organization sold red-capped vials of crack.[20] For a short time, Rincon was one of three spot managers at this location.[21]

In late 1989, Rincon communicated a desire to open his own crack cocaine location and asked the Sepulvedas to supply the cocaine.[22] After an initial refusal, the brothers agreed to provide a supply.[23] With that inventory Rincon started selling crack cocaine at three locations -- 613 East 138th Street, 592 East 141st Street and 600 East 141st Street.[24] Under Rincon's arrangement with the Sepulvedas, he paid them $400.00 for each bundle of cocaine that he sold.[25] Initially, the Sepulvedas supplied red-capped vials, the same type of packaging used by them at the Beekman Avenue address.[26] They later switched to supplying Rincon orange-capped vials because they doubted his business skills and did not want their customers -- or the police -- to associate the Beekman spot with Rincon's

---

[20] Tr. 2473, 2390, 5574, 6351, 8914, 9837-38, 13636-39, 957.

[21] Tr. 9825, 9837-42, 10542, 13668-70.

[22] Tr. 13671, 13705.

[23] Tr. 13671-73.

[24] Tr. 8979-84, 9941, 13670-72, 13705.

[25] Tr. 13673-74, 13705.

[26] Tr. 13673.

8

locations.[27] Subsequently they altered the relationship by supplying only powder cocaine to Rincon, charging him $1,000.00 per kilogram more than they paid for it.[28]

Rincon continued to sell orange-capped crack cocaine vials at his three locations.[29] The Sepulvedas kept control of his inventory by supplying him only about a kilogram of cocaine approximately every five days.[30] From the end of 1989 until late summer 1991 Rincon was the sole manager of his three spots.[31] In August 1991, two other members of the organization -- Jose Llaca and Victor Mercedes -- were released from prison and joined Rincon in operating his locations and also began selling orange-capped vials on Beekman Avenue, thus competing with the Sepulvedas' sellers.[32] Concerned about this encroachment, the Sepulvedas stopped supplying cocaine to Rincon and his cohorts for about one month, but resumed their supply on the agreement of the three men to stop selling on

---

[27] Tr. 13673, 13676.

[28] Tr. 13706-07, 13793.

[29] Tr. 1455, 1777, 8994, 13803-04.

[30] Tr. 13902.

[31] Tr. 8449-50, 9930, 11278.

[32] Tr. 8466-67, 8823, 8987-94, 9961-64, 10594-96, 11284-85, 17912-13.

9

Beekman Avenue.[33]

Although Mercedes returned to prison in September 1991,[34] Rincon and Llaca continued to sell crack cocaine at their locations, and the Sepulvedas continued to supply the cocaine to them for that purpose.[35] In the process, the orange-capped and red-capped crack (the latter sold by the Sepulvedas at their Beekman spot) were prepared in the same locations and stored in the same stash houses.[36] Moreover, a number of co-conspirators worked simultaneously at the Beekman location, run by the Sepulvedas, and at one or several of the locations supervised by Rincon and Llaca. This overlap included both sellers -- among them, co-defendants Linwood Collins, Russel Harris, Daniel Gonzalez and George Santiago -- and money collector Jimmy Montalvo.[37] In addition, Rincon and the Sepulvedas and other personnel of these drug operations routinely met at one of the organization's apartments (located at 354 Cypress Avenue and rented in the name of Merya Betancourt),[38] shared

---

[33] Tr. 13793, 13902-03, 13803-06.

[34] Tr. 17912.

[35] Tr. 8988-95, 9930, 9961-62, 9964, 11278, 11284.

[36] Tr. 10044, 11484-85, 11492-95, 13014-15, 13019, 13031, 13173, 13188, 13238; see Tr. 9934.

[37] Tr. 8994-99, 9934-35, 9941, 9961-66, 11277.

[38] Tr. 1156-61, 1163-64, 1531-33, 1787-88, 1804-06, 9048-51, 13802-03.

weapons,[39] acted together against common enemies,[40] and even hired the same law firm to represent them in the case of an arrest.[41]

Rincon was involved in several murders as part of his cooperative arrangement with the Sepulvedas. In late 1991 a competitor organization, headed by a man named Gerard Hurd, began selling yellow-cap crack cocaine vials in an alley on Beekman Avenue and 141st Street, and charged a lower price than Rincon and the Sepulvedas.[42] Initially Nelson Sepulveda arranged for two of his lieutenants -- co-defendants Wilfredo de los Angeles and Stanley Tukes -- to assault workers for the Hurd organization.[43] When Hurd continued to market crack, Sepulveda conferred with Rincon and de los Angeles, and they decided to get rid of the competition.[44] On December 16, 1991 Rincon, acting with Gonzalez, Harris, de los Angeles and Tukes, ambushed Hurd's crack location and killed four

---

[39] Tr. 11498-500, 11505-08, 13861.

[40] E.g., Tr. 4201-08, 4237-45, 5715-18, 5744-48, 5887-94, 6449-52, 13722-27, 13739-56, 13763-65.

[41] Tr. 9176-79, 11259-61, 13069-73, 13641.

[42] Tr. 1458-59, 3364-66, 3379, 3386-87, 3556-57, 6578, 10013, 13722-25, 13748-49.

[43] Tr. 13724-27, 13734-35.

[44] Tr. 13733-34, 13751.

11

of his workers.[45] Several eyewitnesses identified Rincon as one of the killers.[46]

Rincon was arrested in June 1992 and imprisoned for approximately three months.[47] He was released on September 15, 1992. Nelson Sepulveda fled to the Dominican Republic in January 1992 (although he was extradited back to the United States and testified as a cooperating witness at the trial)[48], and his brother Lenin was arrested in February 1993.[49] With the disappearance of the Sepulvedas, crack sales ended at 348 Beekman Avenue,[50] but Rincon and Llaca continued to operate the crack locations at East 138th Street and East 141st Street, selling the orange-capped crack vials.[51] Moreover, by about the autumn of 1992, Rincon and Llaca became solely responsible for acquiring the cocaine powder to make the crack, a role that they had previously shared with Lenin

---

[45] Tr. 1174-75, 1178, 1203, 1205, 1207, 3237-45, 3401-03, 7176-84, 7225-33, 7324, 7453-66, 7562-64, 7876-78, 8213.

[46] See p. 11 n. 40; Tr. 3844-46, 4201-08, 4237-45, 5744-48, 7453-59.

[47] Tr. 1055, 1791-12.

[48] Tr. 1879, 13572-73, 13806.

[49] Tr. 1150, 1881.

[50] See Tr. 13238.

[51] Tr. 1712-13, 1744-47.

12

Sepulveda.[52] In April and May 1993 an undercover police officer purchased large amounts of crack cocaine at both of these locations.[53] Also in May 1993, Rincon ordered a change from orange-capped vials to green and blue-capped vials because the orange-capped product was "getting too hot with the cops."[54]

On May 15, 1993 Rincon was driving on Jackson Avenue in the Bronx with co-defendants Robert Lopez and Siro Rodriguez. Rincon saw a man whom Rincon believed had shot a drug supplier known as El Feo. Rincon told his car mates that there was a $10,000.00 price on the man's head and gave a gun to Lopez, who shot the man repeatedly, killing him.[55]

On September 15, 1993 the police arrested Rincon, who remained incarcerated from then on.[56] In November 1993 Rincon, together with Tukes and Harris, attacked another prisoner, Glenn Stretching, in a holding cell at the Manhattan Criminal Court. Their stated

---

[52] Tr. 13133-43, 13158-61, 13163-64.

[53] Tr. 1729-36, 1753-72, 10738-40, 10742-44, 10746-48, 10750-52, 10758-61, 10764, 13532-34.

[54] Tr. 13215-16, 13075.

[55] Tr. 11537-52, 13057.

[56] Tr. 17911-12.

13

motivation was their accusation that Stretching was "snitching."[57]

### 3. Perez's Role

Perez, known as "Tezo",[58] began working at the 348 Beekman Avenue spot in 1991.[59] His job principally involved transporting drugs and money between that spot and the stash apartments.[60] He also worked as a shift manager.[61]

On June 5, 1992 Lenin Sepulveda was released from prison. He and Llaca then arranged for Perez to begin selling crack cocaine at several spots in Brooklyn.[62] The crack sold at those locations consisted of both red-capped and orange-capped vials, which Perez obtained at the Bronx apartment of co-defendant Merya Betancourt.[63] Perez's role also involved collecting sales revenues from the spots and either storing the funds at his apartment or giving them to

[57] Tr. 15173-87.

[58] Tr. 9041-42, 16145-46, 16023-24.

[59] Tr. 4153-54, 4161-64, 6376-77, 9045-47, 12215-23, 13719.

[60] Tr. 4153-64, 4548-49, 6376-77, 9041-42, 12222-23, 13719.

[61] Tr. 4548-50.

[62] Tr. 8615-21, 9041-42, 9052-54, 10029-32, 12266-70, 12285-88.

[63] Tr. 12269-70, 12287-88, 12291-95, 12306, 12383, 15622-35.

14

Lenin Sepulveda.[64]

Perez was also involved in the murder of a rival crack dealer, named Juan "Papito" Francisco. On July 10, 1992 Francisco assaulted Perez and one of his co-conspirators, Ramon Madrigal (known as Battata) with a tire iron, apparently because he viewed Perez as a business rival.[65] Perez reported the attack to Lenin Sepulveda and to Llaca.[66] Four days later, accompanied by another man whom he subsequently identified as Llaca, Perez approached Francisco at the Brighton Beach Avenue spot where Francisco and others were selling crack. Perez pointed out Francisco, and his colleague fatally shot the man.[67] The police later recovered the murder weapon at the Betancourt apartment.[68] On September 12, 1992, law enforcement authorities arrested Perez.[69]

---

[64] Tr. 12288-89, 12295-96.

[65] Tr. 12297-309, 14436-39, 14444, 15619, 15638, 15642-43, 15721, 15762.

[66] Tr. 9057-60.

[67] Tr.  9066-74, 15547-53, 15644-51, 15618-19, 15663-64, 16013-19, 16022-24, 16042-52, 16057-62, 16066, 16140-49, 16152-55, 16157-62, 16208-10.

[68] Tr. 12314-19, 13373-75, 13377-80, 16566-68.

[69] Tr. 17928.

15

B. Procedural History

1. In the Trial Court

A New York County grand jury returned a 66-count indictment on November 3, 1993, charging Rincon, Perez and 39 other defendants with a vast array of crimes stemming from their participation in the Sepulvedas' drug distribution network. (Resp. Ex. B at 4; Resp. Ex. F at 3). Prior to trial, 32 of the 41 defendants pled guilty. (Id. at 3 & n.2). Rincon, Perez, and seven other defendants went to trial before the Hon. Leslie Crocker Snyder and a jury, starting on September 20, 1994. (Id. at 3). On May 15, 1995 the jury returned guilty verdicts against Rincon on five counts of second-degree murder, six counts of second-degree criminal possession of a weapon and single counts of first-degree conspiracy, second-degree attempted murder and second-degree assault. (Id. at 1). As for Perez, the jury convicted him of single counts of second-degree murder, first-degree conspiracy and second-degree weapon possession. (Id. at 4 n.4). The other seven defendants were also convicted on various charges. See Llaca v. Duncan, 2004 WL 964113, *11 (S.D.N.Y. May 4, 2004).

On June 27, 1995, Justice Snyder sentenced Rincon to

16

consecutive terms of 25 years to life on the six murder and conspiracy charges, and 8 1/3 to 25 years on the attempted-murder count, while adding concurrently a term of 2 1/3 to 7 years on the assault count. In total, then, he received a prison term of 158 1/3 years to life. (Resp. Ex. F at 1 & n.1). As for Perez, Justice Snyder sentenced him to consecutive terms of 25 years to life on the murder and conspiracy counts and to a concurrent term of 5 to 15 years on the weapon conviction, or a total of 50 years to life. (Resp. Ex. B at 2).

## 2. Perez's Appellate Efforts

Perez and seven other defendants with whom he had been tried (but not Rincon) filed a joint appeal to the Appellate Division, First Department. On his appeal Perez initially pressed six points, several of which are the same ones raised in his current petition. He claimed that: (1) the evidence was insufficient to justify his intentional-murder conviction, and in any event the court should have charged a lesser-included offense of first-degree manslaughter; (2) the trial judge's supplemental instructions on acting-in-concert and on the use of statements by Perez were inadequate; (3) the trial judge's biased conduct at trial had denied defendant his right to the effective assistance of counsel; (4) his sentence was excessive; (5) the trial judge had erred in

17

her instructions regarding the difference between a single conspiracy and multiple conspiracies; and (6) the defendants should have been granted separate trials. (Resp. Ex. A at 15-119; see also Resp. Ex. C). In addition, Perez stated without further explanation that he adopted the arguments of his co-defendants "as applicable to him" (Resp. Ex. A at 4n.2), which presumably incorporated their argument that the State had not proven the existence of the single conspiracy charged in the indictment. Subsequently, in a joint reply brief, Perez joined several other defendants in arguing that the jury-selection process had violated the Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79 (1986), and that the prosecutor's assertedly inflammatory summation had denied the defendants a fair trial. (Resp. Ex. C, 2d Brief at 2-7).

By decision issued March 30, 2000, the Appellate Division affirmed the defendants' convictions and sentencing. In responding to the arguments specifically pressed by Perez, the panel first held that the evidence amply justified his murder conviction, "providing overwhelming proof that he acted in concert with the shooter to murder the victim." People v. de los Angeles, 370 A.D.2d 196, 197, 707 N.Y.S.2d 16, 20 (1st Dep't 2000). It further held that there was no basis for the triers of fact to find that Perez had acted with the intent to cause serious physical injury rather than death, thus precluding the need for an instruction on first-degree

18

manslaughter. Id. at 197, 707 N.Y.S.2d at 20. The court also noted that there was ample evidence that the various defendants had been involved in the single conspiracy charged in the indictment rather than in a series of separate conspiracies. Id. at 197, 707 N.Y.S.2d at 20.

The court next upheld the trial judge's denial of a severance. In doing so, it noted that the evidence mostly concerned a joint enterprise, that there were "no irreconcilable conflicts" among the defenses asserted by the various defendants, and that they did not "take an aggressive adversarial stance against" each other. Id. at 197-98, 707 N.Y.S.2d at 20.

The panel then rejected the defendants' Batson arguments, finding the objections articulated on appeal to have been unpreserved. It alternatively found that the trial judge had followed the required Batson procedures and that her finding that the prosecutors' explanations for their peremptory challenges were not pretextual was justified. Id. at 198, 707 N.Y.S.2d at 21.

Insofar as Perez and other defendants complained about the trial judge's conduct and alleged bias at trial, the panel held that these objections were unpreserved because defense counsel had neither objected at appropriate times nor requested curative

19

measures, and it declined to review the claims in the interest of justice. The court also observed, in the alternative, that the judge's challenged statements and questions at trial were not inappropriate and that her handling of the trial -- including the use of curative instructions after the eruption of some confrontations -- had not denied the defendants a fair trial. Id. at 198-99, 707 N.Y.S.2d at 21.

The court also addressed the prosecutor's summation. It found that most of the challenged comments were responsive to arguments made at trial by defense counsel, and that the summation reflected "no pattern of inflammatory, prejudicial remarks warranting reversal." Id. at 199, 707 N.Y.S.2d at 21.

As for the judge's jury charge and supplemental instructions, the appellate court held that they had been correct in describing the law of conspiracy and the manner of deliberations, and that the judge had properly responded to the jurors' questions in her supplemental instructions. Id. at 199, 707 N.Y.S.2d at 21-22. Finally, the court rejected all challenges to the sentencing court's exercise of discretion and then deemed all remaining claims to be meritless. Id. at 201, 707 N.Y.S.2d at 23.[70]

_____

[70] Two defendants -- not including Perez -- raised separate issues unique to them, and the court rejected both sets of arguments. See id. at 199, 707 N.Y.S.2d at 21 (upholding trial

20

The panel decision was unanimous in rejecting all claims of all of the appellants, except for one issue raised by defendant Linwood Collins, as to which one justice -- the Hon. Enest Rosenberger -- dissented. Id. at 201-05, 707 N.Y.S.2d at 23-26. That issue concerned the disputed admission of a stipulation that had alluded to Collins's prior criminal record by reporting that he had been incarcerated since February 1992.

Following the Appellate Division's affirmance, Perez sought leave to appeal to the New York Court of Appeals by letter dated May 16, 2000. (Resp. Ex. H). In his application he adverted to, and endorsed, a series of arguments pressed by various of his co-defendants, all of whom were also seeking leave to appeal; these included the Batson issue, the severance claim, the propriety of the judge's supplemental instructions in response to juror questions about the conspiracy count, the judge's instructions on first-degree conspiracy, the purported insufficiency of the evidence of a single conspiracy, and the prosecutor's summation. (Id. at 1-2). Perez also specifically argued two other points in his leave letter -- that the trial judge had manifested bias at trial by denigrating defense counsel and interfering with their

court's reopening of State's case concerning defendant Mercedes during summations); id. at 199-201, 707 N.Y.S.2d at 22-23 (upholding use of stipulation regarding dates of incarceration of defendant Collins).

21

presentation of their case and that Perez had been entitled to a charge on first-degree manslaughter as an alternative to second-degree murder. (Id. at 2-10).

By order dated September 12, 2000, the Court of Appeals denied Perez's leave application. In doing so, the court left Perez the option to renew his motion following its decision in the separate appeal of Perez's co-defendant Linwood Collins, whose leave application had been granted by Justice Rosenberger. People v. Perez, 95 N.Y.2d 892, 715 N.Y.S.2d 384 (2000); see Resp. Ex. J. On June 5, 2001 the Court of Appeals affirmed Collins' conviction. People v. Collins, 96 N.Y.2d 837, 729 N.Y.S.2d 433 (2001).[71] Presumably in view of the court's disposition of Collins's appeal, Perez did not renew his leave application.

Perez next sought relief in the Appellate Division by way of a pro se motion for a writ of error coram nobis. In that application, which was dated August 14, 2001, Perez asserted that he had been denied the effective assistance of appellate counsel, because his attorney had failed to cite federal authority in

---

[71] On that appeal Collins argued against the propriety of the use of the stipulation, attacked the trial judge's denial of a severance, criticized the court's Allen charge, complained of judicial bias and asserted that the conspiracy jury charge was flawed. The Court of Appeals rejected the first three claims on the merits and held that the others were unpreserved. Collins, 96 N.Y.2d at 837, 729 N.Y.S.2d at 433.

support of her argument that the trial evidence was insufficient to prove beyond a reasonable doubt that Perez had intended to kill the victim of the shooting in which he had participated. (Resp. Ex. N -- Memo of Law at 5-7). Perez also argued, as he had previously, that the trial court had erred in not charging the lesser-included offense of first-degree manslaughter. (Id. at 8-10). The First Department denied this application by order dated August 8, 2002. (Resp. Ex. O).

### 3. Rincon's Appellate Efforts

By a separate direct appeal to the First Department, petitioner Rincon also sought to challenge his conviction. (Resp. Ex. E). He asserted five grounds in support of his appeal. First, he contended that the evidence was insufficient to establish his participation in a single conspiracy. (Id. at 14-22). Second, he attacked the denial of his severance motion. (Id. at 23-29). Third, he complained about the supposed failure of the trial court to provide a requested instruction that the State must prove identity beyond a reasonable doubt. (Id. at 30-36). Fourth, he asserted that the trial judge had failed to give a proper charge on the law of conspiracy, specifically with respect to the existence of multiple conspiracies. (Id. at 37-48). Finally, he argued that the trial judge had erred in supposedly telling the jurors that they should

23

decide whether any of the prosecution's police witnesses were experts and, if so, they should accept those witnesses' opinions. (Id. at 49-63).

By decision dated November 1, 2001, the Appellate Division affirmed Rincon's conviction. People v. Rincon, 288 A.D.2d 9, 732 N.Y.S.2d 160 (1st Dep't 2001). In so ruling the court held that the trial judge's instructions on the prosecutor's burden to prove identity were correct. It further held that petitioner's claim about police-witness expert testimony and instructions concerning its assessment was unpreserved, and it declined to review the issue. In any event, it said in the alternative, insofar as the trial court had deemed several police detectives to be experts and instructed the jury as to how to assess their testimony, it had acted entirely properly. As for the balance of Rincon's claims, the court noted that they repeated the arguments made on the other defendants' appeal, and it rejected them summarily by alluding to its prior ruling on that earlier appeal. Id. at 9-10, 732 N.Y.S.2d at 160.

On December 14, 2001, Rincon sought leave to appeal to the New York Court of Appeals. He pressed only two arguments on that application -- that the evidence had not established a single conspiracy beyond a reasonable doubt and that the judge's charge on

24

the law of conspiracy was fatally flawed. (Resp. Ex. K). The Court
of Appeals denied Rincon's application by order dated April 15,
2002. People v. Rincon, 98 N.Y.2d 640, 744 N.Y.S.2d 769 (2002); see
Resp. Ex. M.

### 4. Rincon's and Perez's Later Trial-Level Application

In papers dated February 24, 2003, Perez and Rincon,
represented by the same attorney, filed a joint motion to vacate
the judgment pursuant to N.Y. Crim. Proc. L. § 440.10. (Resp. Ex.
P). The stated basis for their motion was the contention that the
prosecutors, in violation of Brady and People v. Rosario, 9 N.Y.2d
286, 213 N.Y.S.2d 448 (1981), had withheld from defense counsel
potentially exculpatory information to the effect that Lenin
Sepulveda had been responsible for the non-fatal shooting of Daniel
Rincon and for the murder of another drug dealer known as "Black"
Miguel Guzman. According to petitioners, these asserted facts --
drawn from two recently published books and said to have been known
to the police -- would have assisted them in demonstrating that the
red-top and orange-top drug operations were part of separate
conspiracies because Rincon and Guzman had been leaders of the
orange-top operation and had competed with Sepulveda's red-top
group. (Resp. Ex. P - Aff. of David Tougher, Esq., ¶¶ 3-20; Memo of
Law at second-ninth pages).

The trial court (now the Hon. Robert Straus) denied the motion in an opinion dated November 1, 2004. (Resp. Ex. S). In doing so, Justice Straus first held that the targeted statements from one of the books could not be deemed withheld evidence, as the author had cited no sources for his assertions. (Id. at 4-5). The judge then observed, with respect to quoted statements in the other book, that the movants had failed to meet the statutory procedural requirement of proffering "sworn allegations" that at least established on a prima facie basis the elements of their claim, and that for this procedural reason the relief sought could be denied. (Id. at 7). He then went to hold that in any event the motion was meritless. This ruling rested in part on the judge's observations (1) that the assertion in the second book that Lenin Sepulveda had told a police detective that he had arranged for the shooting of Rincon was inadmissible hearsay, and (2) that Lenin Sepulveda had been made available to defense counsel but they had never spoken to him. The court also observed that the statement described in that book reflected that the shooting of Rincon had resulted from personal animus between Sepulveda and Rincon -- which was not inconsistent with the existence of one conspiracy -- and that it did not suggest a rivalry between separate conspiratorial organizations. (Id. at 7-9). Finally, the court held that the evidence of a single conspiracy was so overwhelming that introduction of these statements at trial would have had no effect on the outcome. In

26

particular, Justice Straus emphasized the fact that Rincon, as the leader of the orange-top distribution network, had participated -- at the behest of Nelson Sepulveda -- with five members of the red-top organization in the killing of dealers from the rival, yellow-top group, and that he had done so a year after his having been shot. According to Justice Straus, this event "demonstrates the total community of purpose between those associated with Red-Top and those with Orange-Top." (Id. at 9-10).

Rincon and Perez sought leave to appeal from this decision by application filed November 22, 2004. (Resp. Ex. T). The Appellate Division denied the request on December 21, 2004. (Resp. Ex. V).

Again represented by the same counsel, Perez and Rincon filed parallel habeas petitions in this court on January 20, 2005.

#### ANALYSIS

We first address Rincon's petition, which is partly procedurally barred and entirely meritless. We then turn to Perez's petition, which we find is timely but also partially barred and completely meritless.

27

I. The Rincon Petition

Rincon asserts four claims -- one with sub-parts -- in support of his timely petition. We first summarize the statutory limits on the scope of the habeas court's review of challenged state-court decisions, and then address the merits of Rincon's claims.

A. Standard of Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). "[T]he state court need only dispose of the petitioner's federal claim on substantive [not procedural] grounds, and reduce that disposition to judgment.   No further articulation of its rationale or elucidation of its reasoning process is required." Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir. 2001) (citing Sellan, 261 F.3d at 312). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

28

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant

29

habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "[s]ome increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). Accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003). See

30

generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

## B. Sufficiency of the Evidence of a Single Conspiracy

In Rincon's memorandum accompanying his petition, he first argues that the State failed to establish beyond a reasonable doubt that he had participated in a single overarching conspiracy, as charged in the indictment. This claim is plainly meritless, and the Appellate Division's rejection of it obviously did not contradict or unreasonably apply Supreme Court precedent.

In the face of a challenge to the sufficiency of the evidence, a federal habeas court may grant relief only if, after viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). In addressing such a claim, the habeas court's review is "sharply limited." Wright v. West, 505 U.S. 277, 296 (1992). As the Supreme Court has repeatedly emphasized, "[f]ederal courts are not forums in which to relitigate state trials," Herrera v. Collins, 506 U.S. 390, 401 (1993) (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)), and the habeas court consequently "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to

31

convict or acquit." Id. at 402 (emphasis in original). Moreover, a habeas court faced with an evidentiary record "that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wright, 505 U.S. at 296-97 (quoting Jackson, 443 U.S. at 326). "[T]hese principles apply whether the evidence being received is direct or circumstantial," United States v. Nelson, 277 F.3d 164, 195 (2d Cir. 2002)(quoting United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998)), and indeed it is well established that guilt beyond a reasonable doubt may be determined based entirely on circumstantial evidence. See, e.g., Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).

Under these standards it is clear that the trial record contained sufficient evidence to support Rincon's conviction of conspiracy.[72] We begin by briefly reviewing the elements of the crime as defined by state law. See, e.g., Fiore v. White, 531 U.S. 225, 228-29 (1999)(holding that continued imprisonment violated the Due Process clause where conduct underlying conviction did not comport with Pennsylvania Supreme Court's interpretation of relevant criminal statute); Quartararo v. Hanslmaier, 186 F.3d 91,

_____

[72] Rincon's challenge to the sufficiency of the evidence on this charge does not affect the validity of his conviction on the other counts.

32

97 (2d Cir. 1999)("A federal court must look to state law to determine the elements of a crime.").

The New York Penal Law specifies that a person is guilty of first-degree conspiracy if, "with intent that conduct constituting a class A felony be performed, he, being over eighteen years of age, agrees with one or more persons under sixteen years of age to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.17. The State must also prove that at least one participant in the conspiracy undertook "an overt act in furtherance of the conspiracy." N.Y. Penal Law § 105.20.

Rincon does not contest the adequacy of the proof of conspiratorial behavior. Rather, he argues that the evidence could not be treated as sufficient to demonstrate that he and the other defendants had engaged in a single conspiracy, and that the triers of fact could reasonably conclude only that he had participated in a conspiracy to sell orange-capped crack vials, and hence was not part of the conspiracy organized and run by the Sepulvedas, as charged in the indictment. This argument is not sustainable.

The determination of whether defendants were participating in one or multiple conspiracies is fact-intensive, and ordinarily therefore a matter for the jury to determine. See, e.g., People v.

33

Leisner, 73 N.Y.2d 140, 151-52, 538 N.Y.S.2d 517, 523-24 (1989)
(seemingly adopting federal caselaw, including so-called wheel-
conspiracy theory). As the federal courts have repeatedly noted,
all that is required to link multiple selling groups in one
conspiracy is proof of "mutual dependence and support". See, e.q.,
United States v Panebianco, 543 F.2d 447, 453 (2d Cir. 1976).
Accord, e.q., United States v. Berger, 224 F.3d 107, 114-15 (2d
Cir. 2000). Thus the Second Circuit recently noted that

> "[i]n the context of narcotics operations . . . we have
> held that when there are multiple groups within an alleged
> conspiracy, a single conspiracy exists when the groups
> share a common goal and depend upon and assist each other
> and we can reasonably infer that each actor was aware of
> his part in a larger organization where others performed
> similar roles."

United States v. Payne, 591 F.3d 46, 61-62 (2d Cir. 2010)(quoting
Berger, 224 F.3d at 115).  That was certainly true here.

As noted above, the evidence included extensive testimony that
for at least a period of time Rincon was working for the Sepulvedas
as a manager of one or more of their selling spots, which were
marketing red-top vials of crack. The proof also reflected that at
a certain point the arrangement changed in that Rincon was
permitted by the Sepulvedas to open his own sales spots but with
the Sepulvedas supplying the narcotics for those spots and, by
their supply, controlling the volume of sales that Rincon was
permitted to make. The record also reflects that for a period of

34

time Rincon's spots were selling the red-cap vials, just as were the spots under the direct control of the Sepulvedas. Moreover, at all times when Rincon was selling cocaine provided by the Sepulvedas -- in capsules of whatever color -- he was limited in the territory where he was permitted to sell, so as not to intrude on the sales locations of his suppliers. The evidence also made clear that, throughout the relevant period, Rincon acted with at least some degree of coordination with the Sepulvedas and those other co-conspirators who were acting on behalf of the Sepulvedas. Thus they and their partners were meeting regularly at Merya Betancourt's apartment, using each other's weapons, and employing some of the same personnel, and they hired the same law firm to defend them in the case of arrests. Indeed, this coordination extended to Rincon participating with the Sepulveda organization's members in the murder of a rival dealer's sellers, who were impinging on the business of the Sepulvedas. Hence, even though the defendants in this case sold drugs at separate locations, they plainly were operating in a sufficiently closely linked manner to permit a finding of a single conspiracy. See, e.g., People v. Alfonso, 35 A.D.3d 269, 827 N.Y.S.2d 39, 39-40 (1st Dep't 2006)("two separately managed operations . . . were so closely linked that they could only be viewed as a single conspiracy").[73]

_____

[73] The fact that there were occasional disagreements between Rincon and the Sepulvedas -- even violent disputes -- did not prevent the jury from reasonably finding that there was one

In sum, there was ample evidence for a reasonable trier of fact to find, beyond a reasonable doubt, that Rincon had entered into an agreement with the Sepulvedas and others (including some of tender years) to engage in conduct that constituted a class A felony and that overt acts were undertaken by the co-conspirators -- including by Rincon -- in furtherance of that conspiracy. Necessarily, then, the Appellate Division's rejection of petitioner's evidentiary-insufficiency claim was fully consistent with, and not an unreasonable application of, settled Supreme Court precedent requiring proof of all elements beyond a reasonable doubt.

## C. The Trial Judge's Instructions

Rincon's second claim principally targets the trial court's instructions regarding the determination whether the evidence supported the existence of the conspiracy charged in the indictment. Specifically, he complains that the judge did not adequately explain the distinction between a single conspiracy and multiple conspiracies because she did not tell the jurors that they should acquit the defendants if they found that the red-top and

_____

overarching conspiracy. As has often been noted, conspiracies are not immune from this form of disunity and rivalry. See, e.g., United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); United States v. Nersesian, 824 F.3d 1294, 1303 (2d Cir. 1987).

orange-top distributors belonged to "independent" organizations. According to Rincon, the court's failure to so state denied him a fundamentally fair trial, in violation of his right to due process. This argument is groundless.[74]

The standard for establishing a due-process violation in a jury charge is rigorous: "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Waddington v. Sarausad, 555 U.S. ___, 129 S.Ct. 823, 832 (2009) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)); see also Cupp v. Naughten, 414 U.S. 141, 147 (1973). An error in jury instructions does not generally rise to the level of a constitutional violation. See, e.g., Gilmore v. Taylor, 508 U.S. 333, 341 (1992); Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain relief, the petitioner must demonstrate not only that the instruction was erroneous, "'but also that the error violated a right guaranteed to him by federal law.'" Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994)(quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). See, e.g., Cupp, 414 U.S. at 146. The error may involve a mistake in describing the elements of the crime defined

---

[74] In Rincon's petition, though not in his briefing, he also criticizes the judge's charge regarding the State's burden to prove identity and her instructions about the assessment of the testimony of several police witnesses. We address these assertions briefly at the end of this section. See pp. 46-48, infra.

37

by state law, if that failing was of such significance as to deprive the defendant of a fair trial, see generally Sams, 18 F.3d at 171-72 (analyzing charge under state law), or it may involve an error that is, on its face, of constitutional significance, such as misstating the burden of proof, see, e.g., Sandstrom v. Montana, 442 U.S. 510, 514-15 (1979), or the meaning of "reasonable doubt". See, e.g., Sullivan v. Louisiana, 508 U.S. 275, 278 (1993). In any event, however, the petitioner must demonstrate that the erroneous instruction, viewed in the context of the entire charge, denied him a fundamentally fair trial. See, e.g., Waddington, 555 U.S. ___, 120 S.Ct. at 831-32; Estelle, 502 U.S. at 70; McCormick v. United States, 500 U.S. 257, 288 n.3 (1991); Cupp, 414 U.S. at 147; Gaines v. Kelly, 202 F.3d 598, 605 (2d Cir. 2000).

It necessarily follows that the charge is to be read as an integrated whole. See, e.g., Cupp, 414 U.S. at 146-47; United States v. Sabhnani, 599 F.3d 215, 238 (2d Cir. 2010); United States v. Josephberg, 562 F.3d 478, 500 (2d Cir. 2009). Thus, even if a single instruction in a charge, by itself, is erroneous, the conviction is not to be set aside on that basis unless it can be said that "it is 'reasonably likely' that the jury applied the erroneous standard described or implied by those few words." Chalmers v. Mitchell, 73 F.3d 1262, 1267 (2d Cir. 1996)(quoting Victor v. Nebraska, 511 U.S. 1, 16 (1994)).

38

Even if the habeas court concludes that the trial court committed an error of that magnitude, the federal court may not grant relief if the error, in context, was "harmless". See, e.g., Estelle, 502 U.S. at 72; Rose v. Clark, 478 U.S. 570, 583 (1986); Sandstrom, 442 U.S. at 526-27 (remanding for determination of whether invalid instruction was harmless).[75] On that question, the petitioner bears the burden of demonstrating that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 638-39 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Otherwise stated, he must show that the error resulted in "actual prejudice." Id. at 637 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).

In this case Justice Snyder accurately described the contention of the defendants "that as to the conspiracy count the People's proof fails to show the existence of one overall conspiracy" and instead "may show several separate conspiracies with various groups or members." (Tr. 20841). The court then explained the significance of that question, stating:

---

[75] Harmless-error analysis does not apply to so-called structural errors, as distinguished from trial errors. See Rose, 478 U.S. at 576-82. Compare Sullivan, 508 U.S. at 280 (harmless-error analysis inapplicable to error in charge on reasonable doubt).

39

If you find that [the] conspiracy charge[d] in the indictment did not exist you cannot find the defendant guilty of a conspiracy that is not charged in the indictment. . . . [I]n other words, if you find that the conspiracy charged in the indictment did not exist you cannot find the defendant guilty of that conspiracy charge. This is so even if you find that a defendant was a member of some conspiracy other than the one charged in the indictment.

(Tr. 20842). The court further explained to the jury that the question of whether the defendants had participated in "a single unlawful agreement or many such agreements or indeed no agreement at all" was a "question of fact that you the jury [] determine in accordance with the instructions I'm about to give you." (Tr. 20841).

At the conclusion of the court's instructions, the defendants joined in objecting to the charge as given, contending that the court had not told the jurors that they must acquit if they concluded that the defendants had been involved in multiple conspiracies. (Tr. 20936-37). The judge overruled the objection, observing that she had conveyed the point adequately and would "rest on the record." (Tr. 20937).

During deliberations, the jury asked the court whether it could convict any of the defendants of conspiracy if it found that the organization that sold red-top vials was "independent of" the orange-top organization or if it found, alternatively, that "Red

40

and Orange Top operated together for only a portion of the time charged." (Tr. 21281-82). In discussing a response, defense counsel argued to the court that it should tell the jurors to acquit on the conspiracy charge if "the jury concludes something other than a single conspiracy was proved." (Tr. 21286). The prosecutor responded that if "different factions" were "involved together in the conspiracy and if they were together at any point, then there is no multiple conspiracy." (Tr. 21287).

The judge then answered the question in a manner that responded to the inquiry while largely tracking her prior instructions. Notably, she told the jurors that it would "not be accurate" and "would be misleading" to answer the jury's question in the negative and that she would instead review with the jurors the principles governing a conspiracy charge. The judge reiterated that it was for the jury to decide whether there was a single conspiracy, multiple conspiracies or no conspiracy, and also repeated that if the jurors found that "the conspiracy charged in the indictment did not exist, . . . or that a conspiracy with separate and distinct purposes existed, then you cannot find the defendant guilty of the conspiracy charge in the indictment." (Tr. 21299, 21301). In addition, the court advised the jury that if it

> found that the conspiracy charged in the indictment existed between any of the defendants you must then

41

decide as to each defendant on an individual basis
whether that defendant joined the conspiracy with
knowledge of any of its unlawful purposes or some of its
unlawful purposes. . . . [E]ach defendant is entitled to
individual consideration of the proof.

Tr. 21301-02. The judge also repeated her original instructions in

substance as to the elements of a conspiracy. (Tr. 21299-304). The

defendants' counsel ultimately objected to this supplemental charge

as "unbalanced", and the court overruled the objection. (Tr. 21304-

06).

On the appeal by the defendants other than Rincon, the First

Department rejected their challenge to these instructions. In doing

so, it held that, "[v]iewed as a whole, the court's charge and

supplemental instructions with respect to conspiracy in the first

degree and multiple conspiracies conveyed the appropriate legal

principles." de los Angeles, 270 A.D.2d at 199, 707 N.Y.S.2d at 22.

It then reiterated that holding on Rincon's appeal. Rincon, 288

A.D.2d at 9-10, 732 N.Y.S.2d at 160.

As the Appellate Division properly held, the challenged

instructions complied with New York law. The New York Court of

Appeals has held that when the indictment charges a single

conspiracy and the evidence could permit a trier of fact to find

either such a single conspiracy or multiple conspiracies, the trial

judge must give instructions noting the possibility that the jury

might find such multiple conspiracies and advising that the jury must acquit "in the event that [it] concludes that something other than [the] single conspiracy" charged in the indictment "was proved". Leisner, 73 N.Y.2d at 150, 538 N.Y.S.2d at 522. Justice Snyder provided such guidance, both in her main charge and in her supplemental instructions, repeatedly noting the distinction between a single conspiracy and multiple conspiracies and instructing the jurors that they must acquit if they found that the State had not proven the conspiracy charged in the indictment. In short, her charge was consistent with New York law, as the Appellate Division held. In any event, the interpretation of state law by the Appellate Division -- as the state's mid-level appellate court -- is presumptively correct, see, e.g., Parron v. Quick, 869 F.2d 87, 90 (2d Cir. 1989); Powell v. Phillips, 2009 WL 929538, *16 (S.D.N.Y. April 7, 2009); see also Accupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d 259, 265 (2d Cir. 2004), a presumption that Rincon offers us no basis to reject in this case.

The defendants, including Rincon, apparently wanted the judge to tell the jurors that acquittal was mandatory if they found multiple conspiracies, but that is not the law. As the Second Circuit has noted in applying a comparable set of principles to federal conspiracy charges,

43

> Acquittal is not automatically required if the jury finds
> multiple conspiracies because the jury can plausibly decide
> that one of those conspiracies is the single conspiracy
> charged in the indictment, as the court instructed here .
> . . . Therefore, a charge should not instruct that a jury
> must acquit whenever it finds multiple conspiracies;
> acquittal is required only if the jury finds that the
> charged conspiracy is not one of the conspiracies that has
> been proved. . . . What the charge should stress is 'that
> there must be [a] finding of the single conspiracy charged
> and individual knowing participation by each individual in
> it.

Berger, 224 F.3d at 114 (quoting United States v. Aracris, 968 F.2d

1512, 1520 (2d Cir. 1992)). Accord Payne, 591 F.3d at 62 (citing

United States v. Chavez, 549 F.3d 119, 125 (2d Cir. 2008)).


This is precisely what Justice Snyder did. She specified that

the jury must determine for each defendant whether that defendant

participated in a conspiracy that matched the conspiracy charged in

the indictment, and that if such a conspiracy never occurred or any

defendant did not take part in it, that defendant was entitled to

acquittal.[76]


As for the supplemental charge, petitioner would have had the

---

[76] At one point petitioner also argues that the main charge
on conspiracy was "incomprehensible" because of what appear to be
minor transcription errors or else a few isolated wording fumbles
by the judge. (Rincon Memo of Law at 28-29). This is baseless.
First, the petitioner never objected at the time, both waiving
such an objection under New York law, see N.Y. Crim. Proc. L. §
470.05(2), and demonstrating that -- when listened to -- the
charge was certainly comprehensible. Second, petitioner ignores
the requirement that the charge must be reviewed as an integrated
whole, and the fact that, so read, it was perfectly clear.

44

judge answer "no" to the questions posed by the jurors, but that would plainly have been wrong. The jury asked what it should do if it found either that the red-top and orange-top organizations were "independent" or that they had operated together for only a portion of the relevant time period. The fact that two organizations were "independent" -- hypothetically, because they each had separate sales territories and personnel -- would not preclude a finding that the members of those two organizations had conspired with one another, that is, that they had participated in activities linked by a common plan and goal. Moreover, if, for some period of time, they were not "independent", they plainly could be viewed as participating in the one conspiracy that was charged in the indictment. See, e.g., Payne, 591 F.3d at 61 ("Changes in membership [and/or] differences in time periods do not necessarily require a finding of more than one conspiracy.")(quoting United States v. Jones, 482 F.3d 60, 72 (2d Cir. 2006)). In short, the trial judge's refusal to give a categorical "yes" or "no" answer to these questions, and her reference once again to the need for the jury to determine whether the prosecutors had proven the existence of the one conspiracy charged in the indictment and the knowing participation of the defendants in that conspiracy, was proper. Accord Llaca, 2004 WL 964113, at *28-29 (rejecting the same argument by Rincon's co-defendants). Moreover, Justice Snyder's reference back to her original instructions is precisely the type

45

of supplemental instruction that the Supreme Court has upheld in the past. See Weeks v. Angelone, 528 U.S. 225, 234 (2000).

In sum, petitioner fails to demonstrate that the targeted instructions concerning the conspiracy charge were faulty, much less that they denied him a fundamentally fair trial. Still less does he show that the decision of the Appellate Division to reject this jury-charge challenge was contrary to, or an unreasonable application of, settled Supreme Court precedent.

\*                    \*                    \*

As noted, Rincon's petition also refers to two other aspects of the jury instructions as deficient -- (1) the judge's purported failure to instruct that identity must be proven beyond a reasonable doubt and (2) her instructions insofar as they supposedly told the jurors to decide whether several police witnesses were experts, and, if so, how to evaluate their testimony. Although Rincon mentions these points in passing in his petition, he never addresses the basis for those claims in his two memoranda of law.[77] Were Rincon appearing pro se, we would search

---

[77] In an attachment to the petition, Rincon also articulates an argument about the court's refusal to give a lesser-included-offense instruction on manslaughter with respect to the shooting of a man known as "Papito", but that argument applies uniquely to Perez rather than to him. See pp. 84-93, infra.

46

his state-court papers in an effort to determine the basis for these aspects of his jury-charge claim. Since, however, he is represented by competent counsel, we see no reason to do so here.

In any event, his arguments are unpreserved, unexhausted and baseless. The judge did tell the jury that identity had to be proved beyond a reasonable doubt (Tr. 20755), and Rincon never objected to the substance of that instruction. As for the instructions about the police witnesses, neither Rincon nor his co-defendants objected at the time. Moreover, his argument, insofar as it is discernible -- that the judge simply left to the jurors to decision whether to qualify any of the police witnesses as experts -- is groundless, since the court did in fact qualify two police witnesses as experts during their testimony, (Tr. 1539, 16522). Rincon never objected to the court's qualification of these two witnesses -- one a narcotics detective, one a detective with extensive ballistics training -- as experts on narcotics transactions and ballistics respectively. In any event, to the extent that Rincon suggests that the court left to the jury the question of expert-witness qualification, that is simply not the case. The judge qualified the two detectives as experts and then told the jury that, in considering their testimony, it was free to take the witnesses' experience and expertise into account in evaluating their credibility (Tr. 20769-70), an instruction that is

47

perfectly permissible and indeed routine.[78]

## D. Denial of Severance

Rincon next complains that the trial court refused to order separate trials for the defendants. He asserts that this ruling denied him a fundamentally fair trial, in violation of his right to due process. Respondent contends that Rincon failed to exhaust his state-court remedies for this claim and that it is therefore procedurally barred. He further contends that the claim is in any event meritless. We agree with both of respondent's arguments.

Rincon asserted this claim on his direct appeal to the Appellate Division but did not mention it in his leave application to the New York Court of Appeals, choosing instead to raise only his evidentiary-sufficiency and jury-charge claims pertaining to the conspiracy conviction. His failure to assert the severance claim in that application reflects a failure to exhaust his state-

---

[78] We note that Rincon also failed to exhaust these claims, however construed, since he never raised either of them in his leave letter to the Court of Appeals, choosing instead to argue only the sufficiency of the evidence of a single conspiracy and the adequacy of the jury charge regarding the conspiracy count. See, e.g., O'Sullivan v. Boerkel, 526 U.S. 838, 845 (1999) (exhaustion through direct appeal requires application for discretionary appellate review to state's highest court if that procedure is available). Since, however, these claims plainly have no basis, we need not pursue the non-exhaustion/procedural-bar analysis any further. See 28 U.S.C. § 2254(b)(2).

48

court remedies, in violation of the exhaustion requirement of the habeas statute, 28 U.S.C. § 2254(b)(1). See, e.g., O'Sullivan, 526 U.S. at 845; Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005). See also Baldwin v. Reese, 541 U.S. 27, 29 (2004). Nonetheless, plaintiff has no means at present for exhausting his state-court remedies on this claim. He may not return to the New York Court of Appeals because he is entitled to only one leave request. See Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000); Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (citing N.Y. Ct. Rules § 500.10(a)). He is also precluded from raising this claim by an application for post-conviction relief under N.Y. Crim. Proc. Law § 440.10. Under the terms of section 440.10(2)(a), he cannot assert a claim on collateral review if it was raised and addressed on direct appeal. Bossett, 41 F.3d at 829. As noted, petitioner did raise the severance claim in his direct appeal to the Appellate Division, and the court rejected it on the merits. Since it would be fruitless for petitioner now to pursue this claim in state court, we must deem it exhausted for purposes of habeas review, but nonetheless subject to procedural-default analysis. See, e.g., Spence, 219 F.3d at 170; see also Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

Under procedural-bar rules, we may not review the merits of the claim unless petitioner can overcome his procedural default by

49

either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or [establishing]. . . that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Fama v. Commissioner, 235 F.3d 804, 809 (2d Cir. 2000). Petitioner fails to meet either test.

To demonstrate cause, petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," for example, by showing that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials . . . made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (citing Reed v. Ross, 468 U.S. 1, 16 (1984), and quoting Brown v. Allen, 344 U.S. 443, 486 (1953)). While an ineffective-assistance-of-counsel claim could constitute cause, a petitioner seeking to invoke it for this purpose must first present it "to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray, 477 U.S. at 489; see also Edwards v. Carpenter, 529 U.S. 446, 451 (2000)(petitioner cannot assert ineffective assistance as cause unless he asserted it and exhausted his remedies in state court).

50

Rincon has made no attempt to show cause, nor could he plausibly do so. Nothing prevented his appellate counsel from including the severance claim in the application for leave to appeal. The factual and legal bases for the claim were clearly available to counsel, since they were asserted in Rincon's Appellate Division brief. Moreover, to the extent that petitioner might attempt to invoke a Sixth Amendment ineffective-assistance claim to show cause, that effort would be futile because he never raised such a Sixth Amendment claim independently in his state-court proceedings. In any event, such a Sixth Amendment theory would plainly be futile; the omission of the severance claim from the leave application presumably reflects the conscious judgment of the attorney that it was a weak argument and that its inclusion in his leave application would be counter-productive.

Petitioner is also unable to show that a failure to address the severance claim here would result in a fundamental miscarriage of justice. This exception is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496; see also Sawyer v. Whitley, 505 U.S. 333, 399 n.6 (1992). To establish "actual innocence," petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley v. United

51

States, 523 U.S. 614, 623 (1998) (internal quotation marks omitted) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)). In this context, "actual innocence means factual innocence, not mere legal insufficiency." Id. at 623. Furthermore, the petitioner must support his claim "'with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.'" Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004) (quoting Schlup, 513 U.S. at 324); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002).

Petitioner has made no attempt to show that a refusal by this court to address his severance claim would result in a fundamental miscarriage of justice, nor could he make such a showing. For reasons to be noted, he demonstrates no violation of his constitutional rights by virtue of the denial of severance. (See pp. 53-56, infra). Moreover, the trial record reflects overwhelming proof of his guilt on all counts, and he makes no showing to undermine that result, much less proffer new evidence showing factual innocence. In sum, because petitioner cannot show that, at a separate trial, "no reasonable juror would have convicted him" of any of the counts on which he was convicted, Bousley, 523 U.S. at 623, much less acquitted him on all of them, he is unable to satisfy the demanding standards for invoking the "fundamental

52

miscarriage of justice" exception to procedural bar. Coleman, 501 U.S. at 750.

Even if we ignored the procedural bar, we would be compelled to reject Rincon's severance claim on its merits. Both federal and state rules of practice favor the joinder of charges and of defendants where the defendants have been accused of acting jointly, because "consolidated prosecutions 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bring those accused of crimes to trial.'" Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993)(quoting Bruton v. United States, 391 U.S. 123, 124 (1968)). See, e.g., Zafiro v. United States, 506 U.S. 534, 537, 539 (1993). Accord, e.g., People v. Hitel, 180 A.D.2d 820, 821, 581 N.Y.S.2d 801, 802 (2d Dep't 1992) (quoting People v. Cardwell, 78 N.Y.2d 996, 997, 575 N.Y.S.2d 267 (1991)). Consistent with this policy, a denial of severance will trigger due-process concerns only if it appears that the joint trial actually denied the defendant a fundamentally fair proceeding. See Herring, 11 F.3d at 377. Since the trial courts typically have the means to avoid real prejudice in the context of a multi-defendant trial, the trial judge has broad discretion in assessing whether such a joint trial is appropriate. See, e.g., Zafiro, 506 U.S. at 539; United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998); Caldwell, 78 N.Y.2d at 997, 575 N.Y.S.2d at 267.

In this case, there was compelling justification for the joint trial. All nine trial defendants were charged with being, and were proven to be, part of the management structure of the drug-distribution network. The evidence against each of them was both substantial and fairly straightforward, involving the creation and operation of a narcotics-distribution organization, and the commission of a series of crimes -- including drug sales and murders -- committed to keep the business going. All of them were charged with equivalent heinous acts. They did not assert any antagonistic defenses. And although some of the evidence concerned crimes in which not all of the defendants were directly involved, that evidence was admissible against all of them as alleged co-conspirators, since the conduct in question involved overt acts in furtherance of the conspiracy.

Given these circumstances, denial of severance imposed no meaningful prejudice on the defendants.[79] The trial court undertook

---

[79] Rincon seems to have focused on the notion that the court should have separately tried the cases against the red-top and orange-top organizations. This argument is well wide of the mark. The State charged that these two groups were in fact one for conspiracy purposes, and the prosecutors were certainly entitled to attempt to prove that, as they successfully did. Indeed, bifurcated trials targeting, respectively, the red-top and orange-top selling efforts would have exposed Rincon and his co-defendants to two trials and would not have avoided the joinder about which Rincon complains. For example, Rincon was shown to have worked initially in spots that were selling the red-top vials and then later worked in distributing the orange-top vials. Similarly, his colleague Llaca, who also worked selling orange-

54

adequate efforts to avoid juror confusion or unfairness, repeatedly emphasizing to the jury that the evidence must be weighed separately against each defendant. These efforts were apparently successful, since there is no indication that the jurors were confused or improperly influenced by the large number of defendants and the extent of the factual record presented to them. Indeed, their deliberations were extended, continuing for twelve days; the jury submitted many notes, reflecting careful consideration of the many charges and extensive evidence; and the jurors, although they ultimately reached unanimity on most of the charges, deadlocked on seven counts (Resp. Ex. B at 5 n.**), thus reflecting careful, individualized consideration of each of the charges. Moreover, separate trials would have imposed a gargantuan burden on the state court system. The single trial took place amid allegations of witness intimidation (E.g., Tr. 15173-87) and lasted nearly eight months. There is no reason to believe that any separate trials would have been notably shorter or would have lead to different results.

In sum, the decision of the trial court to refuse severance plainly did not lead to a fundamentally unfair trial for Rincon or any of his co-defendants. See Llaca, 2004 WL 964113, *17-19

---

top vials, was shown to have participated in a murder with Perez, who was assisting in the sale of the red-top vials.

(rejecting same argument by Rincon's co-defendants). Necessarily, then, his invocation of the Due Process Clause must be rejected. It equally follows that the Appellate Division's affirmance of the trial court's severance ruling was neither contrary to, nor unreasonable application of, Supreme Court precedent.

### E. The Brady Claim

Rincon's last claim is that he was denied due process because the prosecutors concealed material exculpatory evidence from his attorney before and at trial. He asserted this claim in his and Perez's post-appeal section 440.10 motion, and it was rejected on both procedural and substantive grounds by Justice Straus. Respondent now urges that the claim is procedurally barred, either in whole or in part, and that it is meritless. We agree that the claim has no merit.

In substance, Rincon asserts that the allegedly withheld evidence pointed to the fact that Lenin Sepulveda was responsible for the the 1990 shooting of Rincon and the 1991 shooting of "Black" Miguel Guzman, both of whom were involved in the distribution of orange-top crack vials.[80] This fact is said to be

---

[80] When Rincon was shot in 1990, Guzman temporarily took over management of his spots. (Tr. 10093-94).

56

significant for Rincon's defense because it suggests that during the middle of the alleged conspiracy period (which lasted from 1986 to 1993), the orange-top group was viewed by Sepulveda as a rival to his red-top organization, an inference that is antithetical to the State's theory that Rincon and the Sepulvedas were co-conspirators. As for the basis for Rincon's factual argument, it rests on passages in two books, one published in 1997 and the other in 2000, that provided accounts of some of the events involving Rincon, Guzman and Lenin Sepulveda. According to Rincon, the books demonstrate that the police were aware that Lenin Sepulveda had arranged the shootings, and yet the prosecutors never disclosed that fact to defense counsel.

The first of the cited books, titled Wild Cowboys: Urban Marauders and the Forces of Order, recounted the events surrounding the drug conspiracy of which Rincon and the other defendants were convicted. According to the author, Robert Jackall, a man named "Smiley" shot Rincon on October 23, 1990. The author reported that Smiley apparently did this shooting because he was upset that Rincon would not let him shoot out the street lights on one neighborhood street. The author further recounted, however, that at some point Lenin Sepulveda had told police detective Mark Tebbens that he had ordered Smiley to shoot Rincon and had later arranged for Smiley to be killed. In this account, Sepulveda told the

57

detective that "[d]espite the steady money Lenny earned off the wholly owned subsidiary Orange Top operation, Lenny wanted [Rincon] out of the picture because he was 'getting too big for his britches.'" (Wild Cowboys at 177-78, in Resp. Ex. W).

The second book, Gangbusters: How a Street-Tough Elite Homicide Unit Took Down New York's Most Dangerous Gang, discussed the same drug-gang history. The author, Michael Stone, wrote that Lenin Sepulveda had "set up" Rincon's drug spots at 138th and 141st Street, controlling his cocaine supply and receiving eighty percent of the profits. He too reported a dispute between Sepulveda and Rincon, and said that as a result Sepulveda had hired Smiley to shoot Rincon. (Gangbusters at 141-42, in Resp. Ex. X). He also stated in the book that Sepulveda "was known to have shot" Guzman later on because of an unspecified "business dispute". (Id. at 143). Stone provided no sources for any of his assertions.

When Rincon raised his Brady arguments in his 2004 section 440.10 motion, Justice Straus denied the motion in its entirety.[81] In doing so, he first rejected that part of the motion targeting the Stone book because Stone had provided no sources for his

[81] Insofar as Rincon asserted a claim under Rosario, the court denied the motion because the purported exculpatory statements -- to the extent that they were sourced at all -- assertedly came from Lenin Sepulveda, who did not testify at trial. (Resp. Ex. S at 6-7).

58

factual assertions, and hence, according to Justice Straus, "there is no basis to conclude from the Stone book that the People were in possession of any particular information regarding the shootings of Daniel Rincon or Miguel Guzman prior to trial." (Resp. Ex. Ex. S at 5).

As for the part of the motion that relied on the Jackall book, the judge initially noted that Crim. Proc. L. § 440.30(4)(b) provides that the trial court may deny a section 440.10 motion without a hearing "if 'the motion is based on the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts." Since the motion relied on cited portions of the contents of the book, the judge observed that the "motion may be denied on procedural grounds alone as the defendants have failed to comply with the provisions of CPL 440.30(1)." (Id. at 7). Having noted its discretion to deny the motion on procedural grounds, the court went on to reject it on the merits, stating "However, the court also concludes for the reasons that follow that the motion must be denied on the merits . . . ." (Id.).

In addressing the merits, Justice Straus assumed, for the analysis, that Lenin Sepulveda had made the statement to Det. Tebbens attributed to him by Mr. Jackall and that the operative

59

standard of materiality under the state-law counterpart of Brady was a "reasonable possibility" that the undisclosed material would have affected the verdict. (Id.).[82] With those assumptions, the judge first observed that any statements made by Sepulveda to Det. Tebbens would have been inadmissible hearsay, and that this fact meant that any failure to disclose the statement would not justify setting aside the verdict. (Id. at 8). The court further noted (1) that the defense was aware at all stages of the trial that the prosecutors did not intend to call Lenin Sepulveda to testify, (2) that the defendants believed even before the trial that Sepulveda had been responsible for the shootings of Rincon and Guzman, (3) that Sepulveda could have been made available for an interview by defense counsel, and (4) that defense attorney nonetheless chose not to interview or subpoena him. (Id. at 8). Justice Straus also noted that the cited statement in the Jackall book appeared to suggest only personal animus as the motivator for the shooting of Rincon "rather than establishing that a conflict exist[ed] between separate drug selling organizations." (Id. at 8-9). The court then observed that the proof at trial was overwhelming that Rincon had

---

[82] The New York Court of Appeals has held that, in contrast to the generally applicable materiality test derived from Brady and United States v. Bagley, 473 U.S. 667, 678, 682 (1985) -- that there is a reasonable probability that the withholding of the evidence affected the outcome of the trial -- the test is relaxed to a required showing of a "reasonable possibility" if the defendant specifically requested the material that the State then failed to produce. People v. Vilardi, 76 N.Y.2d 67, 72-77, 556 N.Y.S.2d 518, 520-24 (1990).

participated in the conspiracy charged in the indictment, citing particularly Rincon's involvement in the Sepulveda-sponsored killing of four members of a rival drug gang in December 1991, more than a year after Rincon had been shot. (Id. at 9). Based on all of these circumstances, Justice Straus concluded that there was no reasonable possibility that the non-disclosure of the purported statement by Lenin Sepulveda that he had been responsible for the shooting of Rincon had affected the trial verdicts. (Id. at 9-10).

Rincon now reiterates this Brady claim here. Respondent argues that it is procedurally barred as well as meritless. Although we decline to find that the claim is barred, it is certainly groundless. We first briefly address the procedural-bar question.

If the highest state court to address a claim disposes of it on a "state law ground that is independent of the federal question and adequate to support the judgment," we may not review it unless petitioner demonstrates both cause for his default and prejudice or else establishes that a failure to address the claim would constitute a fundamental miscarriage of justice. See, e.g., Cone v. Bell, 556 U.S. ___, 129 S.Ct. 1769, 1780 (2009) (quoting Coleman, 501 U.S. at 729); see also Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) (citing Harris v. Reed, 489 U.S. 255, 260 (1989)).

61

To be independent, a state court's holding must rest on state law that is not "'interwoven with the federal law.'" <u>Jimenez</u>, 458 F.3d at 137 (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,' . . . reliance on state law must be 'clear from the face of the opinion.'" <u>Fama</u>, 235 F.3d at 809 (quoting <u>Coleman</u>, 501 U.S. at 732, 735). When determining whether we may entertain a claim, we "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001) (quoting <u>Jones v. Stinson</u>, 229 F.3d 112, 118 (2d Cir. 2000)). As for the requirement of adequacy, the state procedural rule must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." <u>Murden v. Artuz</u>, 497 F.3d 178, 192 (2d Cir. 2007) (quoting <u>Monroe</u>, 433 F.3d at 241); <u>see</u> James v. Kentucky, 466 U.S. 341, 348-49 (1984); <u>Cotto v. Herbert</u>, 331 F.3d 217, 239 (2d Cir. 2003) (citing <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999)). However, principles of comity caution against categorizing a state procedural rule as inadequate "lightly or without clear support in state law." <u>Garcia</u>, 188 F.3d at 77 (internal quotation omitted).

Justice Straus suggested a procedural bar only with respect to a portion of the 440.10 motion -- that addressing the Jackall book -- and in doing so he did not unambiguously rely on the procedural ground in rejecting Rincon's application.[83] Instead, he simply noted (1) that section 440.30 gave the trial court discretion to deny a section 440.10 motion if the movant failed to provide substantiating "sworn allegations" and (2) that the motion before him "may be denied on [that] procedural ground[] alone", since Rincon had "failed to comply with the provisions of CPL 440.30(1)." Having noted his power to reject the motion on that ground, however, the judge did not say that he was relying on it. Rather, he moved straight to the substance of the motion and ruled that "the motion must be denied on the merits . . . ." Given this sequence of observations, we cannot say that Justice Straus unambiguously relied on the state procedural requirement, since his opinion does not so state. See, e.g., Jimenez, 458 F.3d at 146 (stating that "a state court's rejection of a claim as 'either unpreserved for appellate review or without merit' . . . is deemed to rest on the merits of the federal claim . . . because there is no plain statement to the contrary.") (quoting Fama, 235 F.3d at

---

[83] In denying the motion insofar as it relied on the Stone book, the court ruled in substance on the merits, holding that since Stone did not provide any sources for the statements cited by Rincon, the motion must necessarily fail since it did not provide a basis for inferring that the prosecutors had evidence corresponding to those statements which they then withheld.

810-11); see also Lopez v. Greiner, 323 F. Supp. 2d 456, 466-67 (S.D.N.Y. 2004) (stating that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar.") (quoting Harris, 489 U.S. at 263). Accordingly, we conclude that no aspect of Rincon's Brady claim is procedurally barred.

Notwithstanding this conclusion, we may readily reject the claim on the merits. We first briefly reiterate the standards for assessing such a claim. In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. at 87. To establish a Brady violation, the petitioner must satisfy three tests. First, he must show that the evidence at issue was favorable to him, because it is either exculpatory or impeaching. See, e.g., Strickler v. Greene, 527 U.S. 263, 282-83 (1999). Second, he must demonstrate that the evidence was suppressed by the prosecution. Id. Finally, the evidence must be material. See id.; Kyles v. Whitley, 514 U.S. 419, 433 (1995).

Evidence is material if "there is a reasonable probability

64

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. The reasonable-probability standard does not require "demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in the defendant's acquittal[,]" nor must the defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35. Rather, the question is whether the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. In making that determination, the court must analyze the potential impact of the suppressed evidence "collectively, not item-by-item." Id. at 436. Finally, if the court decides that the suppressed evidence was material, the defendant is deemed to have been prejudiced, obviating the need for harmless-error review. Id.

There can be little doubt that Justice Straus properly denied that aspect of Rincon's motion that targeted the information contained in the Stone book. As noted, the author made several statements about Lenin Sepulveda's responsibility for the shootings of Rincon and Guzman, but did not attribute the information contained in those statements to any identified source. Plainly, the proffer of the cited passages from the book did not meet

65

Rincon's burden to show that the prosecutors ever had custody of, and withheld from the defense, any information, whether exculpatory or not and whether material or not.

As for the Jackall book, the ultimate conclusion of the trial court was neither contrary to, nor an unreasonable application of, Brady and its progeny. Following the lead of Justice Straus, we deem it appropriate for purposes of this analysis to assume that Lenin Sepulveda did tell Det. Tebbens that he had arranged the shooting of Rincon because he was "getting too big for his britches."[84] We may further infer that the prosecutors had this information in hand (that is, Sepulveda's assertion) before or during the trial.[85]

The requirement that the defendant demonstrate that the information was favorable is not onerous. If the evidence could be viewed as exculpatory, it is favorable for Brady purposes. Thus, if the evidence was susceptible to varying interpretations, one of

---

[84] The State and respondent have never offered any evidence to suggest that this reported communication did not take place.

[85] It is true, as respondent notes, that the book does not specify when Sepulveda communicated this information to Det. Tebbens, but it would be reasonable to infer that this would have occurred during the criminal investigation or at least before or during trial. Afterwards it is unclear why or in what circumstances the detective would have been in communication with Sepulveda. In any case, the State never sought to rebut this inference about the timing of the alleged communication.

66

which would deem it exculpatory and the other as inculpatory, the defendant will have satisfied his burden to show that it was favorable. See United States v. Rivas, 377 F.3d 195, 199-200 (2d Cir. 2004)(vacating conviction on Brady grounds based on suppression of statement that could reasonably be viewed as either exculpatory or inculpatory). See also Kyles, 514 U.S. at 448-49 ("While the jury might have understood that Beanie meant simply that if the police investigated Kyles, they would probably find the murder weapon, the jury could also have taken Beanie to have been making the more sinister suggestion that the police 'set up' Kyles, and the defense could have argued that the police accepted the invitation."). Nonetheless, the ability of the prosecution to effectively rebut defense evidence should also be taken into consideration in assessing the potential impact of withheld evidence on a jury's verdict, that is, its materiality. See id. at 450.

In this case Rincon argued that the fact -- if established -- that Lenin Sepulveda ordered his shooting in 1990 would have assisted him in defending against the accusation that he was conspiring at the time with Sepulveda and his brother Nelson. Focusing solely on the statement that Rincon has targeted, we conclude that he narrowly carries his burden to show that the evidence was favorable, since the statement (including its

67

reference to Rincon becoming "too big for his britches") could conceivably be viewed as probative of the notion that Sepulveda viewed him as a rival and thus -- if he was perceived as too ambitious -- a potential threat to the Sepulveda organization. Although the text could lend itself to the alternative -- and arguably more plausible reading -- that Rincon had been working for the Sepulvedas or at least was in league with them and that the shooting was an internal organizational disciplinary matter, the exculpatory potential of this particular statement is sufficient to classify it as favorable for Brady purposes.

That said, petitioner's claim fails for two reasons. First, the statement is simply not material. Second, petitioner fails to demonstrate that he and his counsel were not already aware of the fact that Sepulveda was likely responsible for the 1990 shooting and able to confirm that fact.[86]

---

[86] We do not rely on Justice Straus's apparent alternative ruling that Sepulveda's statement to Det. Tebbens was not admissible. First, it is not clear that it might not have been admitted, through Det. Tebbens, as a statement against penal interest, a recognized exception to the hearsay rule in New York. See, e.g., People v. Shortridge, 65 N.Y.2d 301, 312, 491 N.Y.S.2d 298, 300 (1985); People v. Abdul, __ N.Y.S.2d __, 2010 WL 3155315, *2 (2d Dep't Aug. 10, 2010). Second, even if it was not admissible through Tebbens, the information might still qualify as Brady material, since it could have led to the presentation of admissible evidence, such as through a decision to subpoena Lenin Sepulveda and ask him whether he had had a role in the shooting.

As Justice Straus properly noted, the evidence at trial -- pertinent portions of which we have already summarized -- demonstrated beyond meaningful question that Rincon was working with the Sepulvedas in the distribution of crack cocaine throughout most of the period alleged in the indictment. Moreover, as the court pointed out, only one year after having been shot, Rincon joined with a group of Sepulveda personnel to shoot and kill four people acting for a rival drug organization, which was selling yellow-top crack on the Sepulvedas' turf. In addition, the very statement allegedly made by Lenin Sepulveda that Rincon cites contains its own indication that Rincon was working hand-in-glove with the Sepulveda group. Sepulveda is described as confirming that "[d]espite the steady money Lenny earned off the wholly owned subsidiary Orange Top operation," he decided to order Rincon's shooting because petitioner had been getting "too big for his britches." In short, the very evidence that Rincon complains about being deprived of could have readily been used by the State to demonstrate that -- as the trial court observed -- the shooting was nothing more than an outgrowth of an in-house quarrel between the Sepulvedas and their associate. In short, it cannot be said with a straight face that there is a reasonable probability that the non-disclosure of the alleged communication by Lenin Sepulveda to Det. Tebbens affected the verdict on the conspiracy charge.

Finally, in any event, Rincon does not establish that he was ignorant of the information that he claims was hidden from him -- that is, the fact that Lenin Sepulveda ordered his shooting. Indeed, he does not dispute that he and his attorneys suspected as much as of the time of trial. (See, e.g., Tr. 1260). Moreover, there is no dispute that the prosecutors offered to make Lenin Sepulveda available to defense counsel, and that the attorneys chose neither to interview him nor to subpoena him for trial. (See Resp. Ex. S at 8-9). Given petitioner's acknowledged belief about Sepulveda's role in his shooting and Sepulveda's apparent willingness to admit his role to the police, there is no reason to believe that Rincon could not have confirmed his suspicion about Lenin Sepulveda by the simple expedient of asking him under oath. Since he chose not to do so, he cannot claim that he was deprived by the prosecutors of the opportunity to confirm that asserted fact, in violation of Brady. See, e.g., United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995)(no Brady violation "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [the evidence].").

Rincon's claim thus fails on its own merits. Moreover, for the reasons that we find the claim meritless, the trial court's denial of his section 440.10 motion was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

70

II. The Perez Petition

Respondent argues that Perez's petition is untimely, and he therefore does not address its merits. We conclude that the petition is in fact timely, but that none of the claims -- most of which simple repeat Rincon's arguments -- provide any basis for awarding Perez relief.

A. Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on the filing of habeas petitions in federal court. 28 U.S.C. § 2244(d)(1). Under its terms, the petitioner has one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" to file a petition in federal court. Id. The judgment is deemed final either when the Supreme Court denies a petition for a writ of certiorari or when the time for making such an application has expired, which is a period of ninety days following final review by the state courts. See, e.g., Williams v. Artuz, 237 F.3d 147, 148-49 (2d Cir. 2001).[87]

_____

[87] Section 2244 specifies three other accrual points, none of which are applicable in this case:

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or

71

The statute of limitations may be tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending", 28 U.S.C. § 2244(d)(2), but such filings do "not reset the date from which the one-year statute of limitations begins to run." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). Additionally, a court may, in its discretion, invoke equitable tolling, but only in "rare and exceptional circumstance[s]." Id. (citing Turner v. Johnson, 177 F.3d 390, 391-392 (5th Cir. 1999)).

Applying these standards, respondent argues that Perez's petition is untimely. Perez does not respond to this argument. Indeed, the petitioners' joint reply memorandum is addressed only to the claims asserted in Rincon's petition.[88] We conclude, however,

_____

laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(B)-(D).

[88] Perez does conclusorily assert timeliness in his initial memorandum of law, but the dates of filings that he cites there, if accepted, indicate that he did not meet the one-year deadline. (Perez Memo of Law at 12).

72

that respondent is mistaken on this point.

The New York Court of Appeals denied Perez's application for leave to appeal on September 12, 2000. If this order were treated as ending his sojourn on direct appeal in the New York State courts -- as both sides seem to do -- his petition would be untimely.

Under this scenario, Perez's one-year clock began to run on December 11, 2000, ninety days after the conclusion of his direct appeal in state court, since he did not seek certiorari. The clock then ran until August 14, 2001 -- 246 days later -- when Perez filed his coram nobis motion. The First Department denied that motion on August 8, 2002.[89] At that time state law did not provide for any application for leave to appeal a coram nobis denial, and hence the running of the clock resumed on that day. Perez took no further action until at least January 6, 2003 -- 151 days later -- when his attorney filed a section 440.10 motion on behalf of him and Rincon.[90]

_____

[89] Respondent mistakenly dates this ruling as occurring on October 1, 2002. (See Resp's Memo of Law at 13). The actual date of the order was August 8, 2002. (See Resp's Ex. O).

[90] Petitioners' papers reflect considerable confusion as to when the section 440.10 motion was filed. The Notice of Motion is dated February 24, 2003, whereas the annexed affirmation of counsel is dated February 24, 2004. (Resp. Ex. P). In contrast, a supplemental affirmation in support of the motion is dated and stamped received as of January 15, 2003. (Id.). Still more confusion is added by petitioner's undocumented assertion in his

73

After the trial court's denial of the motion to vacate, the
Appellate Division denied leave to appeal on December 21, 2004.
Since Perez did not file his habeas petition until January 20,
2005, an additional 30 days passed before the clock was finally
stopped.

Given this history and based on the initial assumption that
the clock began to run on December 11, 2000, Perez would be charged
with 427 days of untolled time between the start of the limitations
period and his filing of his habeas petition. Under this analysis,
his petition would be deemed untimely unless he could establish a
basis for equitable or other tolling. See, e.g., Belot v. Burge,
490 F.3d 201, 205 (2d Cir. 2007)(petitioner has burden to establish
"extraordinary circumstances" to justify tolling). Since he fails
even to attempt to do so, he plainly cannot be found to have met
his burden on tolling.

The problem with this analysis is that the September 12, 2000
denial of leave to appeal was explicitly designated as without
prejudice to renewal following the determination of co-defendant

_____

memorandum of law that the motion was filed January 6, 2003.
(Perez memo of Law at 12). Finally, we have been advised by the
State Supreme Court Clerk's Office that its computerized records
reflect that the motion was filed on February 7, 2003. For
purposes of our calculation, however, we adopt the earliest date
invoked by petitioner -- January 6, 2003 -- but our choice among
these alternatives does not change the ultimate result.

74

Collins's then-pending appeal to the Court of Appeals. (Resp. Ex. J). Thus, it cannot be said that the issuance of the September 2000 order marked "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1). Under the terms of the order denying leave, Perez's time to seek direct review from the state's highest court would not expire until sometime after the determination of the Collins appeal. Thus the proper analysis looks to when the Collins appeal was decided, which was June 5, 2001. People v. Collins, 96 N.Y.2d 837, 729 N.Y.S.2d 433 (2001).

A potential complicating factor is that the September 12, 2000 order denying Perez's leave application did not specify how much time Perez would have to file a renewed application after the Collins decision was issued, but for that purpose we look to the general statutory provision governing the time to file leave applications. Under its terms, a leave application must be made within thirty days "after service upon the appellant of a copy of the order sought to be appealed." N.Y. Crim. Proc. L. § 460.10(5). By analogy, we infer that Perez would have had at least thirty days after the Collins decision was issued and sent to him. Accord Llaca, 2004 WL 964113, at *20 (using same measurement in applying section 2244(d)(1) rule to Perez's co-defendants). Hence, Perez had until July 5, 2001 to seek once again a leave certificate.

75

Since Perez did not renew his leave application, the one-year habeas clock began to run on July 5, 2001. If Perez is then given the proper tolling for his coram nobis and 440.10 motions -- as we have already outlined -- he filed his habeas petition after only 221 days had run. In short, his petition was timely.

B. The Merits

As noted, Perez asserts principally a series of claims also pressed by Rincon. These include claims that the State failed to prove the existence of the single conspiracy charged in the indictment, that the trial court failed adequately to instruct the jurors on how to analyze whether the State had met its burden on that issue, that the judge failed to determine whether two police detectives were experts witnesses and improperly left that decision to the jury and did so without adequate guidance to the jurors as to how to evaluate the testimony of those witnesses, and that the court denied the defendants a fair trial by refusing to grant a severance.

For the reasons already noted in addressing Rincon's petition, these claims are partly procedurally barred and completely meritless. In addition to our prior discussion, we note only that the proof of conspiracy -- which must be assessed on a defendant-

76

by-defendant basis -- amply justified the conspiracy conviction of Perez. As summarized earlier, the testimony reflected that Perez was working for the Sepulvedas in a number of roles, including supervising and otherwise facilitating the distribution of both red-cap and orange-cap crack in Brooklyn as well as red-cap crack in the Bronx. It also reflects that he acted jointly with co-defendant Llaca -- who worked with both the Sepulvedas and with Rincon -- in orchestrating the murder of a rival crack dealer.

Perez also mentions three other claims not raised by Rincon, and we address those claims here. They include ineffective assistance of appellate counsel, denial of due process by virtue of the trial judge's refusal to charge a lesser-included offense of manslaughter and a due-process claim based on judicial bias. None is remotely merited.[91]

## 1. Ineffective Assistance of Appellate Counsel

Although Perez asserted in his petition a claim that he was

---

[91] As noted, the respondent does not address the Perez petition except by arguing that it is untimely. Insofar as respondent briefs its opposition to the Rincon petition, we accept its analysis of those claims as its response to the equivalent Perez contentions. Insofar as respondent does not respond to the three other claims by Perez, we look to the State's arguments in its state-court briefs for its position on these claims.

denied the effective assistance of appellate counsel (Pet. ¶ 12(B)), he did not mention this claim in his 31-page memorandum of law supporting the petition, nor did the two petitioners' joint reply memorandum address this claim (or indeed any other claim by Perez). We are therefore left with the following description of the claim, as articulated in the petition: "Appellate counsel affirmed that she did not rely on any federal constitutional principles and rule in support of her argument and was not aware of the law as supported by her affidavit." (Id.). A further explanation of this claim may be found in Perez's coram nobis motion, in which he complained that his appellate attorney had not cited federal law in Point 1 of her brief to the Appellate Division (Resp. Ex. N -- Memo of Law at 6-7), which argued the following:

> THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH BEYOND A REASONABLE DOUBT PEREZ' GUILT OF INTENTIONAL MURDER. IN THE ALTERNATIVE, SINCE THE EVIDENCE PERMITTED THE JURY TO CONCLUDE THAT PEREZ INTENDED ONLY TO INJURE PAPITO, A LESSER INCLUDED OFFENSE CHARGE WAS MANDATED

(Resp. Ex A at I). According to Perez's coram nobis argument, his attorney's failure to invoke federal law in her appellate brief meant that his claim would not be reviewable in federal court because it would be subjected to a failure-to-exhaust defense. (Resp. Ex. N at 6 (citing Daye v. Attorney General, 696 F.2d 186 (2d Cir. 1982)(en banc), and Rose v. Lundy, 455 U.S. 509 (1985)). For further support of the coram nobis argument, he attached an

78

affirmation from his attorney explaining that she had cited only

state law because "I did not believe that the right to a lesser

included charge could implicate the federal due process clause and

I was unaware of any federal law in support of that proposition."

(Resp. Ex. N -- Aff. of Malvina Nathanson, Esq., ¶ 6).


Petitioner's Sixth Amendment claim does not provide a basis

for habeas relief. Before explaining why, we briefly summarize the

applicable legal standards.


To demonstrate a denial of the effective assistance of

counsel, a petitioner must show that his lawyer's performance was

"so defective that 'counsel was not functioning as the "counsel"

guaranteed the defendant by the Sixth Amendment' and that counsel's

errors were 'so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d

73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S.

668, 687 (1984)). As summarized in Brown:

> To satisfy the first, or "performance," prong, the
> defendant must show that counsel's performance was
> "outside the wide range of professionally competent
> assistance," and to satisfy the second, or "prejudice,"
> prong, the defendant must show that "there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would
> have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord,

79

e.g., Smith v. Spisak, Jr., 558 U.S. ___, 130 S. Ct. 676, 685 (2010); Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009); Henry v. Poole, 409 F.3d 48, 62-64 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

It bears emphasis that the Strickland standard is quite deferential, and that a claim of constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation. Thus, a habeas court weighing an ineffective-assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord, e.g., Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio, 269 F.3d at 95 (citing Strickland, 466 U.S. at 694).

A court's evaluation of an appellate attorney's performance is particularly deferential. Appellate counsel is not required to raise every conceivable issue, because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983); see also McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999)(noting that actions or omissions by counsel that might be considered sound strategy do not constitute ineffective assistance). Thus, to establish a violation of his Sixth Amendment rights, Perez must demonstrate that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); accord Kalani v. United States, 2002 WL 31453094, *3 (S.D.N.Y. Oct. 31, 2002); Peterson v. Bennett, 2002 WL 1592600, *4 (E.D.N.Y. July 18, 2002).

Perez cannot possibly make such a showing. He does not even

81

seek to suggest that counsel's omission of federal case law in support of either of the arguments made in Point 1 of her brief affected the outcome of the state-court appeal.[92] Rather, he limits himself to contending that he was prejudiced in his ability to air these claims in a federal habeas proceeding because counsel's failure to cite federal cases in the Appellate Division brief constituted a failure to exhaust state remedies, as required by the federal habeas statute. There is nothing to this argument.

Insofar as counsel argued the insufficiency of the proof of murder, she complied with at least one of the Second Circuit's criteria for preserving federal claims for habeas review, by asserting that the State had not proved the murder charge "beyond a reasonable doubt." (Resp. Ex. A at 14). As the Second Circuit noted in Daye, and has reiterated in later decisions, a prospective

---

[92] Nor could he reasonably do so. The arguments counsel made in her brief, even if read as invoking only state law concepts, triggered an analysis by the court that paralleled whatever analysis would have been required to assess the comparable federal claims. The Appellate Division found that the evidence was ample to demonstrate Perez's guilt of murder beyond a reasonable doubt -- thereby satisfying the federal consitutional requirement -- and it further agreed with the trial judge that the evidence would not have permitted a reasonable trier of fact to conclude that Perez intended only to cause physical harm to Pepito, hence precluding the need for a lesser-included instruction under either state or federal law. In any event, for reasons noted below, federal case law does not provide a due-process ground for demanding a lesser-included-offense charge in a non-capital case irrespective of the state of the trial record.

82

habeas petitioner may adequately alert the state courts to the federal nature of his claim -- and thereby exhaust his state-court remedies -- by articulating the claim in terms that "call to mind" a federal constitutional right. Daye, 696 F.2d at 194. Accord Desimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006). On that basis, counsel's argument to the Appellate division that the State had failed to prove Perez's guilt "beyond a reasonable doubt" represents an adequate articulation of a constitutional right and thus preserved the claim for habeas review. See, e.g., Holland v. Scully, 797 F.2d 57, 65 (2d Cir. 1987); Hawkins v. West, 706 F.2d 437, 438-39 (2d Cir. 1983). Compare Desimone, 461 F.3d at 190 (petitioner did not assert denial of "reasonable doubt" in state court); Strogov v. Attorney General, 191 F.3d 188, 192 (2d Cir. 1999).[93]

As for petitioner's argument that his attorney's omission denied him the abilty to assert his lesser-included-offense claim in a habeas petition, Perez has in fact asserted that claim in this court, and respondent has not opposed it on the basis of a failure

---

[93] Although Perez did not assert this particular evidentiary-insufficiency claim in his petition, he was free to do so and was not prevented by the fact that his appellate attorney had not cited federal case law. Moreover, such a claim would plainly have failed had it been asserted since the evidence was more than adequate to justify the murder conviction. See pp. 91-93, infra. For this reason as well, Perez fails to demonstrate any prejudice from the asserted omission of federal case law by appellate counsel.

to exhaust state-court remedies. Indeed, we address the claim below
on its merits. Hence, appellate counsel's asserted failure to cite
federal case law in support of the underlying claim has not
prejudiced Perez. In any event, as his attorney, Ms. Nathanson,
appeared to suggest in her coram nobis affirmation, federal case
law does not support the petitioner's constitutional theory and
hence it was reasonable for her not to cite it.[94]

## 2. Denial of Lesser-Included-Offense Instruction

Perez also complains, as he did in state court, that the trial
judge should have honored his request for an instruction as to the
lesser-included offense of first-degree manslaughter as an
alternative to the murder charge in connection with the slaying of
Pepito. He contends that the evidence could reasonably have been
viewed by a jury as reflecting an intent by him to inflict only
serious physical injury rather than death on the victim, hence
triggering a right to the requested charge. The short answer to
this claim is that the habeas statute and current Supreme Court

---

[94] We address below the merits of Perez's claim about the
denial of a lesser-included-offense charge. We note here only
that, as Ms. Nathanson suggested, the Supreme Court has
explicitly declined to hold that the failure to provide such a
charge in a non-capital case may violate due process, see Beck v.
Alabama, 447 U.S. 625, 638 n.14 (1980) and the Second Circuit has
therefore declined to uphold such claims in habeas proceedings.
E.g., Jones v. Hoffman, 86 F.3d 46, 48 (2d Cir. 1996).

84

jurisprudence preclude granting the requested habeas relief.

The Supreme Court has held that in *capital* cases a defendant has a constitutional right to an instruction on a lesser-included offense if the evidence warrants it. Beck, 447 U.S. at 637-38. In Beck, the Court stated that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." Id. at 38. However, the Supreme Court expressly reserved the question of whether the Due Process Clause requires that the jury be given a lesser-included-offense charge in *non-capital* cases, id. at 638 n.14., and has not yet resolved that question. In the wake of Beck, the Second Circuit has also declined, in the habeas context, to rule on whether there is a constitutional right to a lesser-included-offense charge in non-capital cases, stating that it is precluded from doing so because it would be creating a new constitutional rule in violation of Teague v. Lane, 489 U.S. 288 (1989). See Jones, 86 F.3d at 48[95]; see also Jones v. Donnelly, 487 F. Supp. 2d 403, 409 (S.D.N.Y. 2007); Mannix v. Phillips, 390 F. Supp. 2d 280,

---

[95] Since Jones was decided, the so-called "new rule" rule of Teague has been superseded by section 2254(d)(1). See Williams, 529 U.S. at 379-80.

295 (S.D.N.Y. 2005) (citing Jones, 46 F.3d at 48).[96]

Because the Supreme Court has not decided whether there is a constitutional right to a lesser-included-offense charge in non-capital cases, Beck, 447 U.S. at 638 n.14, the Appellate Division's decision upholding the trial court's ruling on this matter cannot be said to have been "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For much the same reason, the challenged decision did not unreasonably apply "clearly established Federal law," since the Supreme Court has not spoken to the precise question and the Second Circuit has not suggested that other Supreme Court case law has, by implication, established a principle that denial of lesser-included-offense instructions in non-capital cases may violate due process. 28 U.S.C. § 2254(d)(1); see Beck, 447 U.S. at 638 n.14; Jones, 86 F.3d at 48. In short, Perez cannot

---

[96] In United States v. Zapata-Tamallo, 833 F.2d 25, 28 (2d Cir. 1987), an appeal from a federal conviction, the Second Circuit stated, in dictum, that due process requires that a lesser-included-offense charge be submitted to a jury "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." Id. (internal quotation marks omitted) (quoting Hopper v. Evans, 456 U.S. 605, 612 (1982)) (alteration in original). Later habeas decisions, however, have not treated this as precedent, but rather have declined to rule on the issue. Jones, 86 F.3d at 48 (citing Rice v. Hoke, 846 F.2d 160, 164 (2d Cir. 1988)); Knapp v. Leonardo, 46 F.3d 170, 179 (2d Cir. 1995); Jones v. Speckard, 827 F. Supp. 139, 146 (W.D.N.Y. 1993) (in dictum), aff'd mem., 14 F.3d 592 (2d Cir. 1993); Smithwick v. Walker, 758 F. Supp. 178, 187 (S.D.N.Y 1991), aff'd mem., 948 F.2d 1278 (2d Cir. 1991).

prevail on the merits of this claim.

Nonetheless, in the interest of completeness and in deference to the fact that the respondent has not addressed the issue in a federal-law context, we note that an argument might be formulated for the notion that, based on prior precedent, even in a non-capital case an egregiously erroneous failure by a trial judge to provide a lesser-included-offense charge might trigger a due-process problem if the error were sufficiently prejudicial to the defendant. That said, in this case no such showing can be made by petitioner.

As we have noted above, challenges to jury charges are generally not of constitutional dimension, and habeas relief is not usually granted for a claim that a jury charge violated state law. See, e.g., McGuire, 502 U.S. at 71-72 (citing Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983)). Nonetheless, if a defective instruction "infected the entire trial," the error may rise to the level of a due-process violation. Waddington, 129 S.Ct. at 832; Cupp, 414 U.S. at 147; Davis, 270 F.3d at 123, 131-32. Otherwise stated, the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Waddington, 129 S.Ct. At 832 (quoting Estelle, 502 U.S. at 72); accord Jackson v. Edwards, 404

87

F.3d 612, 624-25 (2d Cir. 2005) (noting that courts must examine whether denial of charge was "'sufficiently harmful to make the conviction unfair'") (quoting Davis, 270 F.3d at 124).

By way of example, a criminal defendant has a constitutional right to a "meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citing California v. Trombetta, 467 U.S. 479, 485 (1984)). The right to present a defense is a "minimum essential[] of a fair trial." United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)). As part of this constitutional right, the defendant is entitled to "a jury charge that reflects any defense theory for which there is a foundation in the evidence." United States v. Abcasis, 45 F.3d 39, 42 (2d Cir. 1995) (internal quotation marks omitted) (quoting United States v. Johnson, 994 F.2d 980, 988 (2d Cir. 1993)); see also Davis, 270 F.3d at 124 (citing People v. Padgett, 60 N.Y.2d 142, 144-45, 468 N.Y.S.2d 854 (1983)); accord, e.g., Jackson, 404 F.3d at 624-27. The defendant has a right to such an instruction even if the trial court believes that the defense is "tenuous." United States v. Bok, 156 F.3d 157, 163 (2d Cir. 1998) (citing United States v. Dove, 916 F.2d 41, 47 (2d Cir. 1990)).

Petitioner might be heard to argue in this case that if he

88

established a sufficiently viable evidentiary basis for a lesser-included-offense instruction, the failure to provide it would trigger a due-process violation, at least if it seems likely that a jury, given the option to convict on the lesser charge, would have chosen to do so. In this case, even assuming the viability of such a legal theory, we find no evidentiary basis to sustain it.

As the Second Circuit noted in both Jackson and Davis, the court first must consider whether state law required an instruction that the state court failed to grant.  See Jackson, 404 F.3d at 621-24; Davis, 270 F.3d at 124-31. Since the record did not compel the requested charge under New York law, Perez's hypothetical claim must fail.

Section 300.05(1) of the New York Criminal Procedure Law addresses the appropriateness of lesser-included-offense instructions, stating

> In submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense.

N.Y. Crim. Proc. Law § 300.50(1) (McKinney 2005). In People v.

Glover, 57 N.Y.2d 61, 453 N.Y.S.2d 660 (1982), the Court of Appeals
read the discretionary language of section 300.05(1) as reflecting
an entitlement of a defendant to such a charge in defined
circumstances, and it specified a test for determining whether the
defendant is entitled to a lesser-included-offense charge:

> To establish entitlement to a lesser included offense
> charge, the defendant must make two showings. First, it
> must be shown that the additional offense that he desires
> to have charged is a 'lesser included offense,' i.e., that
> it is an offense of lesser grade or degree and that in all
> circumstances, not only in those presented in the
> particular case, it is impossible to commit the greater
> crime without concomitantly, by the same conduct,
> committing the lesser offense. That established, the
> defendant must then show that there is a reasonable view of
> the evidence in the particular case that would support a
> finding that he committed the lesser offense but not the
> greater.

Id. at 64, 453 N.Y.S.2d at 661.

When determining whether a jury should be charged with a
lesser-included offense, the court must examine the evidence in the
light most favorable to the defendant, although the jury may accept
or reject any of the evidence it is given. People v. Galvin, 104
A.D.2d 527, 528, 479 N.Y.S.2d 896, 898 (3d Dep't 1984) (citing
People v. Henderson, 41 N.Y.2d 233, 236, 391 N.Y.S.2d 563, 566
(1976)). The focus of the analysis is on whether a jury could
reasonably acquit defendant of the greater crime and convict him of
the lesser crime, not whether there is persuasive evidence that

90

defendant was guilty of the greater crime. See e.g., People v. Hartman, 4 A.D.3d 22, 26-27, 772 N.Y.S.2d 396, 400 (3d Dep't 2004) (citing People v. Van Norstrand, 85 N.Y.2d 131, 136, 623 N.Y.S.2d 767, 770 (1995)).

The parties in this case do not dispute that first-degree manslaughter is a lesser-included offense of second-degree murder. Nevertheless, for petitioner to have been entitled to the lesser manslaughter charge, there must be a reasonable view of the evidence to support the finding that he was guilty of manslaughter and not guilty of murder. The contrary conclusion of the Appellate Division on this question is certainly defensible.

The Appellate Division concluded that petitioner was not entitled to the lesser charge of second-degree manslaughter under N.Y. Penal Law § 125.20(1) because there was no reasonable view of the evidence that suggested that Perez intended to cause only serious physical injury rather than death. De los Angeles, 270 A.D.2d at 197, 707 N.Y.S.2d at 20. An examination of the record amply supports the court's conclusion.

Days before the shooting, Perez vowed that he would kill Pepito, a vow motivated by th victim's disruption of one of Perez's crack locations and his having attacked Perez with a tire iron.

91

(Tr. 9057-61, 12307-08, 15638, 15642, 15721, 15762). This intent was borne out at the time of the encounter. When Perez and the gunman confronted Francisco, Perez remarked to the victim "Do you remember me . . .? You look like a man in peace." (Tr. 16051). That remark plainly suggested that Francisco was about to die. At that point the gunman asked "[w]hich one is it?", and Perez responded "[t]he one in the middle" and pointed at Francisco. (Tr. 16-51-52, 16066, 16148, 16152, 16154-55). The gunman then shot Francisco from a distance of about five feet, striking him at least eight times in the upper body and killing him. (Tr. 15547-53, 16052, 16059, 16148-49). This scenario alone reflected only an intent to kill. See, e.g., People v. Porteous, 193 A.D.2d 631, 597 N.Y.S.2d 446 (2d Dep't 1993); People v. Evans, 192 A.D.2d 671, 672, N.Y.S.2d 90 (2d Dep't 1993); People v. Rieilly, 190 A.D.2d 695, 696-97, 593 N.Y.S.2d 275, 277-78 (2d Dep't 1993). Perez then fled with the gunman and later bragged about the killing. (Tr. 9066-72, 12311, 12347). This too compellingly established that petitioner shared the evident intent of the gunman to kill Francisco.[97]

---

[97] In Perez's appellate brief he argued that his failure to conceal his identity and the absence of evidence that he told the gunman to kill Francisco within earshot of witnesses weighs in favor of an inference that he did not know in advance that the gunman intended to kill the victim. (Resp. Ex. A at 15-16). Given all of the cited circumstances, these facts cannot be said to weigh significantly in the balance. The absence of concealment could easily be read as reflecting simply an expectation that Francisco would die and hence not be in a position to identify Perez or else the assumption that the killing of Francisco would so terrorize any passers-by that they would be too frightened to

92

Since petitioner's demand for a lesser-included-offense instruction was not supported by the record, he was not denied his due-process rights when no such charge was given (even if due process might conceivably protect a defendant's right to such a charge in appropriate circumstances). Necessarily, then, the decision of the Appellate Division to affirm the trial court's ruling was not an "unreasonable application" of federal law under 28 U.S.C. § 2254(d)(1) and did not rest on any findings not permitted by the evidentiary record. See 28 U.S.C. § 2254(d)(2).

3. Judicial Bias

Perez's remaining claim, again articulated in the attachment to his petition but not briefed by him in this proceeding, is that Justice Snyder so persistently denigrated defense counsel and their efforts to defend their clients in front of the jury that she denied them a fundamentally fair trial. This claim, rejected by the Appellate Division as both unpreserved and meritless, is also unsustainable.

As a general matter, the federal courts have long noted that

---

talk. The lack of an explicit directive to the gunman at the site of the killing is virtually meaningless since presumably on a mission to kill, the perpetrators would have made their plans beforehand and did not need to instruct each other on their basic goal at the time of the shooting.

the trial judge need not sit by silently during the course of a trial, but rather "may actively participate in a jury trial." United States v. Bejasa, 904 F.2d 137, 141 (2d Cir. 1990). As the Second Circuit has observed, the judge "need not sit like a 'bump on a log' throughout the trial." Id. (quoting United States v. Pisani, 773 F.2d 397, 403 (2d Cir. 1985), reh'q denied, 787 F.2d 71 (1986)). Accord, e.q., United States v. Bellomo, 176 F.3d 580, 596-97 (2d Cir. 1999); United States v. Matt, 116 F.3d 971, 974 (2d Cir. 1997) (citing United States v. Leslie, 103 F.3d 1093, 1104 (2d Cir. 1997)); United States v. Mickens, 926 F.2d 1323, 1327 (2d Cir. 1991). In particular, it is perfectly appropriate for the court to ask questions in order to clarify ambiguities in the testimony, e.q., United States v. Messina, 131 F.3d 36, 40 (2d Cir. 1997); Matt, 116 F.3d at 974; United States v. Manko, 979 F.2d 900, 905 (2d Cir. 1992); United States v. 141st Street Corp., by Hersh, 911 F.2d 870, 881 (2d Cir. 1990); United States v. Gurary, 860 F.2d 521, 527 (2d Cir. 1988), or to correct misstatements by the witness, e.q., Matt, 116 F.3d at 974; Manko, 979 F.2d at 905; Pisani, 773 F.2d at 403, or to make a record for purposes of the court's own rulings. E.q., Matt, 116 F.3d at 974; Manko, 979 F.2d at 905; United States v. Mazzilli, 848 F.2d 384, 388 (2d Cir. 1988); Pisani, 773 F.2d at 403.

The appropriate limits on a trial judge's intervention in the

94

trial are derived from the underlying principle that the court "must maintain an appearance of impartiality." United States v. Victoria, 837 F.2d 50, 54 (2d Cir. 1988). To this end, the judge, by her conduct, "should not . . . give the impression to the jury that [she] believes one version of the evidence and disbelieves or doubts another." Mazzilli, 848 F.2d at 388. See, e.g., Messina, 131 F.3d at 41; Bejasa, 904 F.2d at 141; Victoria, 837 F.2d at 55; Pisani, 773 F.2d at 403. Nonetheless, even when exercising its supervisory authority over the conduct of federal trials -- a process that involves a more searching review of the trial record than does habeas review of state-court proceedings for alleged constitutional error, see, e.g., Daye v. Attorney General of the State of New York, 712 F.2d 1566, 1570-71 (2d Cir. 1983) -- the Second Circuit will not reverse a conviction based on a claim of bias unless "the [trial] judge's behavior was so prejudicial that it denied [defendants] a fair, as opposed to a perfect, trial." Gurary, 860 F.2d at 527 (quoting Pisani, 773 F.2d at 402). Accord, e.g., Bejasa, 904 F.2d at 141. In making this determination, the court looks to "'the entire record'", id. at 141 (quoting Mazzilli, 848 F.2d at 389), and has repeatedly characterized the appellant's burden as "substantial." E.g., id. at 141. See also Mickens, 926 F.2d at 1327 (looking for "substantial[] taint"); Gayle v. Scully, 779 F.2d 802, 813 (2d Cir. 1985).

Thus, even when the trial judge has engaged in occasional adversarial questioning of defense witnesses or has spoken sharply to an attorney, the Second Circuit has refrained from reversing a conviction unless it finds clear prejudice. In justifying these holdings on a case-by-case basis, the circuit court has noted such factors as the infrequency of the inappropriate conduct, the insignificance of the testimony about which the trial judge expressed apparent skepticism, the substantiality of the evidence against the defendant, and the use of curative instructions to emphasize that the jury alone is responsible for deciding guilt or innocence. See, e.g. Messina, 131 F.3d at 40; Mickens, 926 F.2d at 1327-28 & n.1; 141st Street Corp., 911 F.2d at 881; Bejasa, 904 F.2d at 141 & n.2; United States v. Mills, 895 F.2d 897, 905-07 (2d Cir. 1990); Gurary, 860 F.2d at 527 & n.7; Pisani, 773 F.2d at 403-04.

As noted, these standards are drawn from caselaw in which the circuit court was exercising its supervisory authority over federal judges. Significantly, the extent of federal habeas review of state trial judges' conduct of criminal trials is substantially narrower. See, e.g., Daye, 712 F.2d at 1570-71. Accord, e.g., Garcia v. Warden, Dannemora Correctional Facility, 795 F.2d 5, 7-8 (2d Cir. 1986); Gayle, 779 F.2d at 813; Johnson v. Scully, 727 F.2d 222, 226 (2d Cir. 1984).

On its face, the "fundamental fairness" standard applied to federal constitutional claims of excessive court intervention appears quite similar to the "fair trial" supervisory review standard governing federal trials. See Daye, 712 F.2d at 1571. Moreover, the Second Circuit has observed that the constitutional standard is "somewhat ill-defined". Johnson, 727 F.2d at 226. Nonetheless, a review of the cases suggests some basic guidelines.

As noted in Daye, excessive court intervention raises two underlying concerns. First, the judge's communication of her views as to the merits poses the danger that "the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict. The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case." Daye, 712 F.2d at 1571. Second, "the judge's statement creates a risk that the trial [may] not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense." Id. at 1572.

Notwithstanding these concerns -- which also appear to govern in the non-constitutional context -- the federal courts will not

97

overturn a state-court conviction except in fairly extreme circumstances. "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." Id.. Although not defined with geometric precision, this standard requires the court to look to both the extent of the intervention and, more importantly, its nature. Thus, even "adverse" questioning of a defense witness by a judge will not by itself demonstrate a denial of a fundamentally fair trial, "because even the most neutrally phrased questions, asked solely for clarification, may elicit answers devastating to the defendant." Id.. Furthermore even if the judge poses one or more questions "obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense" -- an involvement that is generally considered inappropriate or "ill advised" -- this does not render a trial constitutionally unfair. Id. at 1572. See, e.g., Gayle, 779 F.2d at 806-97; Johnson, 727 F.2d at 226-27; Peterson v. Scully, 1991 WL 135621, *3-4 (S.D.N.Y. Jul. 16, 1991).

Judged by these standards, petitioner's claim may be readily rejected. In Perez's state appellate brief, he spent nearly 90

98

pages attacking the conduct of the trial judge. In doing so he cited an array of comments, rulings and questions by her in the course of voir dire and to a lesser extent during the trial, all of which, he asserted, cast a negative pall on his attorney and counsel for his co-defendants in the eyes of the jury.

As the Appellate Division observed in its rulings, most of these actions by the judge were not objected to. Thus, the claim of judicial misconduct was not preserved, since "defendants did not register an appropriate objection to the court's overall conduct during trial or request any corrective action." de los Angeles, 270 A.D.2d at 198, 717 N.Y.S.2d at 21 (citing People v. Charleston, 56 N.Y.2d 886, 453 N.Y.S.2d 399 (1982)). Since this ruling reflects an independent and adequate ground for rejecting the due-process claim, it cannot survive absent a showing of cause and prejudice, Coleman, 501 U.S. at 750, or a demonstration that failure to consider the claim would constitute a fundamental miscarriage of justice, Murray, 477 U.S. at 496. Petitioner makes no effort to fit himself within either category, and would not succeed if he attempted to do so.

In addition, as we noted earlier, although Perez listed this claim in conclusory terms in his petition, his accompanying briefing ignores it, and, unlike a pro se petitioner, he cannot

99

justify requiring the court to intuit what he would argue here in support of his claim when he fails to proffer any argument whatsoever. Finally, in any event the appellate court's substantive ruling on the merits of the claim as briefed in the state court was entirely justified. The vast litany of petitioner's complaints, as embodied in his state-court briefing, rest in part on misstatements of the record or ignore the context of the cited comments, many of which are simply efforts by the judge to rein in attorneys who were not following proper procedure or ignoring her rulings. The argument further flies in the face of the concerted efforts by the judge both to balance her occasional rebukes with compliments for defense counsel and to offer the jury curative instructions in the wake of any conflicts -- instructions we must assume that they followed in their deliberations. See, e.g., Weeks, 528 U.S. at 234 (citing Richardson v. Marsh, 481 U.S. 200, 206 (1987)); United States v. Stewart, 590 F.3d 93, 124 (2d Cir. 2009).[98]

In view of the record, this is plainly not a case in which the judge, by her conduct, led the jury to believe that she had a particular view about the guilt or innocence of any of the defendants, and it is certainly not a case in which the court

_____

[98] Given the lack of briefing by petitioner and the capaciousness of record citations in the state-court briefs, we choose simply to summarize the basic contentions of petitioner rather than undertake an exhaustive account of the many instances of court action about which Perez complained in state court.

manifested such hostility to counsel as to deny their clients a

fundamentally fair trial. As the Appellate Division properly found:

the court took necessary steps, in this complex, multiple-
defendant case, to clarify confusing testimony and to
facilitate the orderly and expeditious progress of the
trial. Although at times, confrontations erupted between
defense counsel and the court, the court's prompt curative
instructions served to dispel any possible prejudice. The
jurors are presumed to have followed these instructions and
the court's conduct could not have deprived any of the
defendants of a fair trial in light of the overwhelming
evidence of each defendant's guilt.

De los Angeles, 270 A.D.2d at 198-99, 707 N.Y.S.2d at 21.

In sum, this claim is procedurally barred and meritless.

## CONCLUSION

For the reasons stated, we recommend that the writ be denied

and the petitions of Rafael Perez and Daniel Rincon dismissed with

prejudice. We further recommend that the court deny a certificate

of appealability in the absence of any issue warranting appellate

review. See Slack v. McDaniel, 529 U.S. 473, 484 (2000); 28 U.S.C.

2253(c).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure,

the parties shall have fourteen (14) days from this date to file

written objections to this Report and Recommendation. Such

objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Laura Taylor Swain, Room 755, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated: New York, New York
       September 8, 2010

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed today to:

David Touger, Esq.
Peluso & Touger, LLP
70 Lafayette Street
New York, New York 10013

David M. Cohn, Esq.
Assistant District Attorney
   for New York County
One Hogan Place
New York, New York 10001